Marshall, Ch. J.,
 

 did not sit in the trial of this cause. The other judges, except Chase, J., whose ill health prevented his attendance, gave their opinions
 
 seriatim.
 

 Johnson, J.
 

 Upon the trial of this cause, in the court below, two grounds of defence were assumed by the plaintiffs in error. 1. That the policy had been avoided, by a deviation from the voyage insured. 2. That if the insured were entitled to recover at all, it could only be for an average, not a total loss.
 

 
 *230
 
 In the argument before this court, the first ground was varied, and the plaintiffs in error contended, “ that the risk insured was never entered upon.” Without considering the propriety of entering upon the discussion of a question so materially different from that made in the bill of exception, I will only remark, that it was judicious in the counsel, to abandon an opinion, as inconsistent with natural reason, as it is with the established doctrine of the law of insurance. An intent to do an act, can never amount to the commission of the act itself. That an intended deviation will not vitiate a policy, and that the vessel remains covered by her insurance, until she reaches the point of divergence, and actually turns off from the due course of the voyage insured, is a doctrine well understood among mercantile men, and has uniformly governed the decisions of the British courts from the case of
 
 Foster
 
 v.
 
 Wilmer
 
 to the present time.
 

 *385] The doctrine now insisted on by the plaintiffs in error, was probably suggested by some incorrect expressions attributed to Lord Mansfield in the case of
 
 Wooldridge
 
 *v.
 
 Boydell.
 
 It is said, that the judge, in that case, expressed an opinion, that “ if a ship be insured from A. to B., and before her departure, the insured determine that she shall call at C., which is out of the usual course of the voyage from A. to B., this is rather a different voyage than an intended deviation.” This opinion was certainly in no wise material to the decision of that case, and is expressly contradicted by the case of
 
 Newley
 
 v.
 
 Ryan,
 
 and a case, which I consider with much respect, decided in the state of New York, between
 
 Menshaw
 
 and
 
 The Marine Insurance Company of New York.
 
 We can only vindicate the accuracy of his lordship’s opinion, in the case which he states, by supposing that his mind was intent upon those cases of intended deviation, in which a
 
 suppressio veri
 
 or necessary increase of risk, are the grounds of decision.
 

 The ordinary rule for ascertaining the identity of a voyage insured, is by adverting to the
 
 termini.
 
 A rule which is certainly correct, so far as it extends, but in the rigid application of which, it is easy to conceive, that cases may occur, in which it would bear injuriously upon the insurer. If it has any defect, it is in not extending far enough the claim to indemnity, as the
 
 terminus ad quern
 
 may, in many instances, be relinquished, without any possible increase of risk, or even without varying the risk, except only as to lessening its duration. I will instance the case of an insurance from America to St. Petersburg, when the vessel, in fact, is to terminate her voyage at Copenhagen; or the case of an insurance to Alexandria, in Virginia, when the vessel is to terminate her voyage at Georgetown, in Maryland.
 

 Whether the risk insured against in this case ever was incurred, I would test by the question, whether, if the Eliza had arrived in safety, or even had sailed for Europe, the insured might have legally demanded a return of the premium ? I presume, not. The insurance being at and from the port of Kingston, the risk commenced during her stay in port, and cannot be apportioned, when thus blended, but was wholly and indefeasibly vested in the underwriters, although the vessel *had forfeited her policy, by shaping -* her course for Europe, the moment she had left the port of Kingston. In the case before us, she adhered to her ultimate destination, and the forfeiture of her insurance could not have been incurred, until after entering the Chesapeake, and actually bearing away farther eastward than was consistent with her course to the Potomac.
 

 
 *231
 
 2.- With regard to the question, whether it be a case of total or average loss, a very few observations will suffice to satisfy the mind that the judgment below is correct. If, under every combination of circumstances, the insured is bound to procure money, at whatever interest, or to raise it, at whatever sacrifice of property, to defray the disbursements for repairs, reshipping a crew, salvage, costs of suit, and every incidental expense, this will be shifting the loss from the insurer to the insured. Should it be admitted, that in the case before us, the insured were under any greater obligation to ransom and refit the vessel than the insurer, the circumstances in evidence are sufficient to excuse him. Unsuccessful attempts had been made to dispose of both vessel and cargo, and as to raising money on bottomry, who would have accepted the security of a vessel, embarrassed by the loss of her register, to a degree, the extent of which could not possibly be forseen; a bond for money to become due on the arrival of a vessel, which, perhaps, might never be able to sail, or if she did sail, without her necessary documents, would be exposed to innumerable hazards, and among them, the forfeiture of her insurance for that very cause.
 

 It is true, that a ease of capture and re-capture, where the two events are communicated, before an election to abandon has been actually communicated to the underwriters, will not, of itself, sanction an abandonment. Yet, it is equally true, that in a case of capture, a re-capture alone will not deprive the party of his right to abandon. The consequences of the capture and recapture, the effect produced upon the fate of the voyage, must govern the right of the parties. This effect is always a matter of evidence, and must rest much upon *the discretion of a jury. This doctrine is well poo^ illustrated in the cases of
 
 Pringle
 
 v.
 
 Hartley,
 
 and
 
 Goss
 
 v.
 
 Withers
 
 .
 

 In the case before us, the information of the capture, re-capture and sale, was communicated in the same letter. The loss was then certainly total, and as the insurers cannot charge the insured with any premeditated design to involve the vessel in the difficulties which broke up the voyage, I think, they ought to bear the loss.
 

 Much has been said about the liability of the insured for the misconduct of his agents, but as all amounts to a charge that they did not make use of forced means to raise money for the release of the vessel, an obligation not incumbent upon them, it does not appear to me, that the extent of the liability of the insured for the acts of the master or supercargo, after the death-stroke is given to the voyage, need be considered.
 

 Washington, J.
 

 There are but two questions in this cause, which I deem worthy of particular consideration ; for the last exception is, to the refusal of the court to give an opinion upon a matter of fact, and for which no foundation was laid by the evidence spread upon the record, even if it had been proper for the court, in such a case, to give an answer to the question propounded. I also lay out of the case, the award mentioned in the declaration, not only because no breach is assigned which applies to it, but because no opinion was asked of, or given by, the court, respecting it.
 

 The first subject which claims attention is, whether, upon the facts stated in the second bill of exceptions, the court below was right in the direction given to the jury, that there was no deviation, at the time of capture, from
 
 *232
 
 the voyage insured, and that the voyage insured was actually commenced. The facts, material to the decision of this point, are, that the Eliza cleared out at Kingston, for Alexandria, and a bill of lading was signed by the *00 o-i master, to deliver her cargo at Alexandria. That after her Clearances -* were obtained, she took in a cargo for Baltimore, and bills of lading were signed, for delivering the same at that port. That the master sailed from Kingston, with an intention previously formed, of proceeding first to Baltimore, and there landing part of her cargo, and then to go to Alexandria, but she was captured, before her arrival at the dividing point between Baltimore and Alexandria.
 

 It is admitted, that this is not a case of deviation, because the intention, formed at Kingston, before the voyage commenced, of going first to Baltimore, was never carried into execution. The only question then is, whether the voyage described in the policy was changed or not ? As to this, there is no difference of opinion at the bar, respecting the legal effect of an alteration of the voyage, on the contract of indemnity ; it is, and must be, conceded, that the policy never attached. But the difficulty is, in determining what circumstances do, in point of law, constitute such an alteration as will avoid the policy.
 

 The criticisms of the counsel for the plaintiffs in error, upon the rule «contended for by the defendants, ought not, in my opinion, to avail them, if that rule be firmly established by uniform decisions : for in questions which respect the rights of property, it is better to adhere to principles once fixed, though, originally, they might not have been perfectly free from all objection, than to unsettle the law, in order to render it more consistent with the dictates of sound reason.
 

 The first case we meet with, upon this subject, is that of
 
 Carter
 
 v.
 
 The Royal Exchange Assurance Company,
 
 which is cited in
 
 Foster
 
 v.
 
 Wilmer,
 
 decided in 19 Geo. II. The former was an insurance on a ship from Honduras to London, and the latter on a ship from Carolina to Lisbon, and at and from thence to Bristol. In both, a cargo was taken in, to be delivered' at an intermediate port; but the loss having happened, before the ship had arrived at the dividing point, the insurers were held liable, upon the ground that nothing more was intended than a deviation, which, not being carried into execution, did not avoid the policy.
 

 *The case of
 
 Wooldridge
 
 v.
 
 Coydell
 
 is next in point of time. This was an insurance on a ship, at and from Maryland to Cadiz. She cleared for Falmouth, and a bond was given to land the whole cargo in Britain. No evidence was given, that the vessel was bound to Cadiz ; she was taken, before she came to the dividing point. At the trial of this cause, Lord Mansfield told the jury, that if they thought the voyage intended was to Cadiz, they were to find for the assured ; but if there was no design to go to that port, then they were to find for the defendant, and the ground upon which the court decided the motion for a new trial was, that there never was an intention to go to Cadiz. But it is plain, that if Cadiz had been intended as the ultimate port of destination, the clearing out for an intermediate port, with an intention to land the cargo there, would not have been considered as anything more than an intended deviation.
 

 Way
 
 v.
 
 Modigliani
 
 was decided in 1787, and was an insurance, at and from the 20th October 1786, from Newfoundland to Falmouth, with liberty
 
 *233
 
 to touch at Ireland. She sailed, on the 1st of October, from Newfoundland, went to the Banks, and fished until the 7th, and then sailed for England, and was lost on the 20th. The reasons assigned for the decision of this case, give it the appearance of an authority unfavorable to the doctrine laid down in the above eases. But the weight of it is greatly diminished, if it be not destroyed, by the following considerations : 1st. That as there was a clear deviation, it was unnecessary to decide the other point, that the policy did not attach ; and 2d. That this latter opinion seems to have been entertained only by one of the court, and even this judge seems to have relied very much upon the fact, that the vessel sailed to the Banks ; 3d. From what is said in
 
 Eewley
 
 v.
 
 Myan,
 
 it would appear, that the ship, when she left Newfoundland, did not sail for England, and of course, the voyage insured never was commenced.
 

 Kewley
 
 v.
 
 Ryan,
 
 decided in 1794, was a policy on goods, from Genoa to Liverpool. The ship sailed on that voyage, but it was intended, as plainly appeared by the clearances, to touch at Cork. She was lost, however, before she arrived at the dividing point; and the decision conformed to those given in the preceding cases, the
 
 Hermini
 
 of the intended voyage be- « „ ing really the same as those described in the policy. *-
 

 The case of
 
 Stott
 
 v.
 
 Vaughan,
 
 decided at
 
 Nisi Prius,
 
 in 1794, before Lord Kenton, seems opposed to the principles laid down in the preceding cases, and, if we have an accurate report of it, is inconsistent with the decisions of the same judge in
 
 Kewley
 
 v.
 
 Ryan,
 
 and other cases.
 

 Murdoch
 
 v.
 
 Potts,
 
 decided in 1795, was, in principle, as strong a case of a change of voyage, as that of
 
 Wooldridge
 
 v.
 
 Boydell,
 
 but equally contributes to explain the general doctrine laid down in all the cases. For in this, the
 
 terminus ad quem
 
 was, most obviously, St. Domingo, where the freight insured was payable, or some port, other than Norfolk, where the ship was to call for the sole purpose of receiving orders.
 

 The last English case which I shall notice, is that of
 
 Middlewood
 
 v.
 
 Blakes,
 
 decided in 1797. It was an insurance on the Arethusa, at and from London to Jamaica, for which place she cleared out; but the master was bound by orders, to call at Cape St. Nichola Mole, in order to land stores there, pursuant to a charter-party. She was captured, after she had passed the dividing point of three several courses to Jamaica, but before she had reached the subdividing point of the continuing course to Jamaica and that leading to the Mole. The whole court considered this as a case of deviation only, and Lawrence, J., was so strongly impressed with the weight of former decisions, that, not attending to this obvious objection to the plaintiff’s recovery, but considering the
 
 termini
 
 of the voyage intended, to be the same with those mentioned in the policy, his first opinion inclined to the side of the plaintiff.
 

 The case of
 
 Henshaw
 
 v.
 
 The Marine Insurance Company,
 
 decided in the supreme court of New York, confirms the principles of the above cases, and would command my respect, were it opposed to them.
 

 The rule, then, which I consider to be firmly established, by a long and uniform course of decisions,, is, that if the ship sail from the port mentioned in the policy, with an intention to go to the port or ports also described ^therein, a determination to call at an intermediate port, either with a view to land a cargo, for orders, or the like, is not such a change of *-
 
 *234
 
 the voyage as to prevent the policy from attaching, but is merely a case of deviation, if the intention be carried into execution, or be persisted in after the vessel has arrived at the dividing point.
 

 The next question is, whether the court below erred in refusing to instruct the jury, that if they believed the facts stated in the first bill of exceptions, they were to find an average and not a total loss ? The defendants in error contend, that by the capture and re-capture of the vessel, under the various circumstances of loss of crew, inability to pay the salvage and expenses, loss of register, &c., the voyage insured was completely defeated, and therefore, the assured had a right to abandon and demand as for a total loss. On the other side, it is insisted, that the master might, in a variety of ways, have prevented the sale of the vessel, and that if he had done the best in his power for the interests of all concerned, he might have liberated the vessel from the lien of the captors, and have performed his voyage in safety to Alexandria, without any other inconvenience than this temporary interruption, and the payment of salvage and expenses. If so, that it was not competent to the assured, under these circumstances, to convert a loss, partial in its nature, into a total one.
 

 Whether the assured had a right to abandon, and recover as for a total loss, or not, was a question of law, dependent upon the point of fact, whether, upon the whole of the evidence, the voyage was broken up, and not worth pursuing ; and in consideration of this question, the jury would, of course, have inquired, amongst other matters, whether the master had done what was-best for the benefit of all concerned. The court might, with propriety, have statéd the law arising upon this fact, whichever way the jury might find it, and indeed, such would have been their duty, if a request to that effect had been made. But the court very correctly refused to give the direction as prayed, because, by doing so, they would have decided the important matter of fact, upon which the law was to arise, which was only proper for the determination of the jury. In the case of
 
 Mills *v. Fletcher,
 
 which turned upon the question, whether the master, by his conduct, had not made the loss a total one, Lord Mansfield would not decide, whether the loss was total or not, but informed the jury, that they were to find as for a, total loss, if they were satisfied that the master had done what was best for the benefit of all concerned.
 

 Upon the whole, then, I am of opinion, that the judgment ought to be affirmed.
 

 Paterson, J.
 

 This action was brought on a policy of insurance, which John and James H. Tucker, being British subjects, residents at Alexandria, had effected on the body of the sloop Eliza, her tackle, apparel and furniture, to the value of $3800, at and from Kingston, in the island of Jamaica, to Alexandria, in the state of Virginia. The policy bears date the 1st of September 1801.
 

 The first question to be considered is, whether the voyage on which the sloop Eliza set out, was the same or a different voyage from the one insured ? By the terms of the policy, it is stipulated, that the Eliza was to sail from Kingston to Alexandria ; and it is stated in the bill of exceptions, that she did sail from Kingston, but with an intention to go first to Baltimore, and there deliver twenty hogsheads and ten tierces of sugar, and then to proceed
 
 *235
 
 to Alexandria, which was the port of destination described in the policy. She cleared out at the custom-house in Kingston, on the 10th of August 1801, for Alexandria, and the master signed a bill of lading to deliver her cargo at that place ; after which, he took in the sugar, to be delivered at Baltimore. It is contended, on the part of the insurers, that the taking in the sugar, to be landed at Baltimore, constituted a different voyage from the one agreed upon, and vitiates the policy ; or, in other words, that the voyage which was the subject of the contract, was never commenced. From a review of the cases which have been cited, the principle is established, that where the
 
 termini
 
 of a voyage are the same, an intention to touch at an intermediate port, though out of the direct course, and not mentioned in the policy, does not constitute a different voyage. In the present case the
 
 termini,
 
 or beginning and ending points of the intended *voyage, were r*ggg precisely the same as those specified in the policy, to wit, from Kingston to Alexandria, and, in legal estimation, form one and the same voyage, notwithstanding the meditated deviation.
 

 The first reported case on this subject is
 
 Foster
 
 v.
 
 Wilmer,
 
 in 2 Str. 1249, in which Lee, Ch. J., held, that taking in salt, to be delivered at Falmouth, a port not mentioned in the policy, before the vessel went to Bristol, to which place she was insured, was only an intention to deviate, and not a different voyage. And the Chief Justice, in delivering his opinion, mentioned the case of
 
 Carter
 
 v.
 
 Royal Exchange Assurance Company,
 
 where the insurance was from Honduras to London, and a consignment to Amsterdam ; a loss happened before she came to the dividing point between the two voyages, for which the insurer was held liable. The adjudication in Strange was in the 19 Geo. II., and from that time down to the year 1794, we find no variation in the doctrine.
 

 A remarkable uniformity runs through the current of authorities on this subject. In
 
 Kewley
 
 v.
 
 Ryan, 2
 
 H. Bl. 343, Trinity term 1794, the principle is recognised ; and in
 
 Henshaw
 
 v.
 
 Marine Insurance Company,
 
 February 1805 (2 Caines 274), it is fortified and considered as settled by the supreme court of New York. In a lapse of sixty years, we find no alteration in the doctrine, which is sanctioned, and has become too deeply rooted and venerable by time, usage and repeated adjudications, to be shaken and overturned at the present day. It has grown up into a clear, known and certain rule, for the regulation of commercial negotiations, and is incorporated into the law-merchant of the land. Where is the inconvenience, injustice or danger of the rule ? It operates in favor of the insurers, by a diminution of the risk, and not of the insured, who have the departure in contemplation ; for if the vessel, after she has arrived at the point of separation, should deviate from the usual and direct road to her port of destination, the insurers would be entitled to the premium, and exonerated from responsibility. An intention to deviate, if it be not carried into effect, will not avoid the policy there must be an actual deviation. The policy being “ at and from,” the risk commenced ; there was also an actual inception of the voyage described; for the Eliza sailed from Kingston for Alexandria, was captured in a *direet course to the latter, before she reached the dividing point; *- and, therefore, the underwriters became liable for the loss.
 

 The second point in the cause is, whether the insurers were liable for a total or a partial loss ? And here a preliminary question presents itself.
 
 *236
 
 Was the abandonment made in proper time? When the Tuckers received information of the loss, it became incumbent on them to elect whether they would abandon or not; and if they intended to abandon, it was incumbent on them to give notice of such intention to the underwriters. Our law has fixed no precise period within which the abandonment shall be made, and notice of it shall be given to the insurers ; but declares, that it shall be done within a reasonable time. In the case before us, it appears that John and James H. Tucker received information of the capture and re-capture of the Eliza, at the same time, in a letter from W. & B. Bryan
 
 &
 
 Co., dated on the 26th September 1801 ; but it does not appear when the letter came to hand. On the 26th of November 1801, the Tuckers offered to abandon the Eliza to the insurers, which offer was rejected. Can it, under these circumstances, be pretended, that the Tuckers were guilty of neglect, or that the abandonment was not made according to the settled rule ? It was made within a reasonable time, and no neglect can justly be imputed to them. We must have some facts whereon to build the charge of negligence, for it is not to be presumed ; and the intervening period between the date of the letter and the time of abandonment, after making a due allowance for the passage of the letter, does not afford sufficient ground on which to raise the imputation of neglect.
 

 This brings us to the great question in the cause, whether the insurers were liable for a total or an average loss. On the 22d August 1801, the Eliza was captured by a Spanish armed schooner, in the usual course from Kingston to Baltimore and Alexandria, and a day or two afterwards, was re-captured by a British sloop of war, and carried into Kingston, on the 26th of the same month. The mere acts of capturing and re-capturing are not, of themselves, sufficient to ascertain the nature and amount of the loss sustained. The loss may be total, though there be a re-capture.
 
 Hamilton
 
 v.
 
 Mendes,
 
 2 Burr. 1198;
 
 Aguilar and others
 
 v.
 
 Rodgers,
 
 7 T. R. 421. Whether the loss be partial or total, will depend upon the particular *3951 ^cumstances of the case, which it becomes necessary to take into i view.
 

 The Eliza was consigned to Bryan
 
 & Go.,
 
 at Kingston, who were authorized to dispose of her; they endeavored to sell her, but without effect; and it is stated, that they could get no offer for her, before she sailed from Kingston, nor since that time. Bryan & Co. put on board ten tierces of coffee, of the value of $1000, belonging to the Tuckers, to be delivered at Alexandria; and when she was captured, all the seamen, except Bell, the ostensible master, and one man, were taken on board the Spanish schooner. The Eliza was navigated under a British register, during the voyage; which register was lost, by reason of the capture and re-capture, and has never been found. After the re-capture, the Eliza and her cargo were libelled in the vice-admiralty court for salvage; a claim was put in by Bryan
 
 & Co.,
 
 as agents for Eli Richards Patton, the real and navigating master and supercargo; and the sloop and cargo were adjudged to be lawful re-caption on the high seas, and ordered to be restored, on paying to the re-captors one full eighth part of the value of the slooj) and cargo, for salvage, with full costs; and to ascertain the value, it was further ordered, that the sloop and cargo should be forthwith sold by the claimants, unless the value should be otherwise agreed upon. The sloop was insured for $3800, and sold for $915; the
 
 *237
 
 coffee sold for $1000; and tbe costs, charges and commissions amounted to $909, which almost absorbed the sum for which the sloop was sold. It is not found, that the sloop had sustained no damage by the capture and recapture; and, considering the difference between $3800, the value insured, and $915, the price for which she sold, the jury might, without other evidence, have presumed that she had received considerable injury.
 

 From these facts, taken together, the inference is rational and just, that the voyage was broken up and destroyed, and that the underwriters were liable for a total and not for an average loss. To repel this inference, and remove responsibility from the insurers, it has been urged in argument, that the agents for the Tuckers were guilty of gross neglect and misconduct. If Bryan
 
 &
 
 Co. ceased to be agents, after the sailing of the sloop, then *the master became clothed with an implied authority to do what was *• fit and right, and most conducive for the interest and benefit of all the concerned ; and therefore, whether the agency of Bryan
 
 &
 
 Co. continued, or, being at an end, devolved, by operation of law, on the master, is perfectly immaterial ; for the question still recurs, whether the actual or implied agent had been guilty of fraud, negligence or other improper conduct, which will exonerate the insurers. I am not able to discern any misconduct on the part of the agent, that would exculpate the underwriters, and prevent their being responsible for a total loss. And indeed, this was a point proper for the decision of the jury, agreeable to the case of
 
 Mills
 
 v.
 
 Fletcher,
 
 in Doug. 230, and therefore, the exception taken to the opinion of the court was not well founded.
 

 The sloop could not be sold at private sale, and, by reason of the capture and re-capture, she might have sustained considerable damage. To sell the coffee, which constituted the cargo for Alexandria, to satisfy the salvage and costs, would have been an imprudent measure; for the redemption would have absorbed the whole proceeds, and then she would have returned to Alexandria, without a cargo, as the master had no funds to purchase one ; and besides, she must have sailed without a register, which would have exposed her to great and unnecessary danger. Prudence dictated the sale as a safe step, and most for the benefit of the concerned.
 

 The error set forth in the third bill of exceptions is, that the court below refused to instruct the jury, that the loss of the register, by means of the capture and re-capture, was not sufficient, in law, to defeat the voyage from Kingston to Alexandria, and might have been supplied by special documents. Though the register did not impart any physical ability to the sloop in regard to her sailing ; yet, it was a document which tended to communicate safety, as it designated her character, individually and nationally. It is a necessary paper, and operates as a national passport; for, without it, she might be seized as an unauthorized rover on the ocean, and in certain cases, would have been liable to confiscation. The register is a document *of such a special and important nature, that its loss cannot be fully made up by other official papers. It would have been a very imprudent step, for the master to have proceeded on his voyage, without a register; if he had, he would have been justly charged with improvidence, negligence and culpable misconduct.
 

 Cushing, J.
 

 I consider this as clearly a case of intentional, not actual
 
 *238
 
 ■deviation ; but not as a case of non-inception of the voyage insured. This is proved by a number of cases cited; and contradicted by none.
 

 What a case of non-inception is, is shown by the case of
 
 Wooldridge
 
 v.
 
 Boydell,
 
 Doug. 16, where the ship was insured from Maryland to Cadiz, having no intention at all of going there ; but that is totally different from the present case, where the vessel was cleared out at Jamaica for Alexandria, with a cargo taken in for Alexandria, and intended to go there. It is true, sugars were taken in for Baltimore, and the master intended going there first. That amounts only to an intent to deviate ; but no deviation, unless executed.
 

 This is proved by divers authorities.
 
 Middlewood
 
 v.
 
 Blakes, 7
 
 T. R., 162, B. R., a ship insured at and from London to Jamaica, and the master had orders (exactly like the case at the bar) to touch at Cape St. Nichola Mole, to land stores, pursuant to charter-party. Upon which, one of the judges (Lawrence) gave an opinion, that if the vessel had been captured, before she came to the dividing point between the northern and southern courses to Jamaica, the insurers would have been liable. And the other judges agreeing with Judge Lawrence, to lay the whole stress of the cause in favor of the insurer, upon the master’s not exercising his judgment at the time, upon which was the best and safest of the three courses (whose judgment the insurers had a right to have the benefit of), but taking the northern course, merely in pursuance of orders, to land stores at Cape St. Nichola Mole. All this shows that had the master exercised *his judgment in going the northern course, as being the best and safest, the whole court would have held the insurer liable, as the vessel was captured before she came to the dividing point between the course to the Cape and to Jamaica.
 

 Another case, more direct and decisive, is
 
 Foster
 
 v.
 
 Wilmer,
 
 2 Str. 1248, 1249, where the ship was insured from Carolina to Lisbon and to Bristol, and the master took in salt, to deliver at Falmouth, before going to Bristol, repugnant to the specification of the policy, yet, being captured before arriving at the dividing point between Falmouth and Bristol, the insurer was held liable, which seems exactly the present case. The mere taking in goods for another port does not, of itself, make a deviation. It may, however, if it materially vary the risk, and be a circumstance designedly concealed and suppressed, excuse the underwriters. In the present case, it does not appear, materially, to vary the risk, any more than in taking in stores to land at Cape St. Nichola Mole, in the case of
 
 Middlewood
 
 v.
 
 Blalces,
 
 varied the risk, which was not suggested by court or counsel, that it did ; or the taking in salt to land at Falmouth, in the case of
 
 Foster
 
 v.
 
 Wilmer.
 
 It did not delay the voyage, in the present case
 
 ;
 
 the vessel sailed with convoy, as soon as it was ready, and was afterwards captured in the proper course, before deviating.
 

 The award may be laid out of the case, for more reasons than one. I think it void for uncertainty.
 

 As to the loss, whether total or average, the jury, who had the whole evidence before them, have, in effect, found a total loss, and the voyage broken up. It is not certified by the court, that the bill of exceptions contains the whole evidence ; and as strong circumstances (I think conclusive ones) are stated, that show the voyage could not be safely pursued, or could
 
 *239
 
 not be pursued at all, in consequence of tbe loss of register and loss of bands by tbe capture, either of wbieb, it does not appear, could be supplied, I tbink, we are not warranted to overrule tbe verdict, or reverse tbe judgment.
 

 Judgment affirmed.