**HAMPTON ROADS CARRIERS, Inc.,**
a body corporate,

v.

**BOSTON INSURANCE COMPANY and**
**Felix R. Sullivan, Jr., & Co., Inc.**

Civ. No. 8884.

United States District Court
D. Maryland.

April 12, 1957.

Semmes, Bowen & Semmes, George D. Hubbard, Baltimore, Md., and David H. Batchelder Jr., Norfolk, Va., for plaintiff.

Lord, Whip & Coughlan, Baltimore, Md., George W. P. Whip, Baltimore, Md., for defendants.

R. DORSEY WATKINS, District Judge.

This suit was brought by plaintiff, Hampton Roads Carriers, Inc. (Hampton Roads) against Boston Insurance Company, (Boston) and Felix R. Sullivan, Jr. & Co., Inc. (Sullivan), defendants. The suit sought reformation of a policy of marine insurance issued by Boston to Hampton Roads and judgment thereon as so reformed for Hampton Roads against Boston, or in the alternative, for judgment against Sullivan for Sullivan's failure to obtain a policy of insurance with the coverage requested by Hampton Roads. The theory of Sullivan's liability stated in the complaint was that it had "acted without authority from defendant, Boston". During the course of the trial and at the hearing on defendant's motion for a new trial, the theory of recovery against Sullivan was changed to the claim that it was either acting as agent for both Hampton Roads and Boston or for Hampton Roads only and that as such agent, it was negligent in failing to secure the type of policy requested by Hampton Roads.[1]

In January of 1956 Hampton Roads, a recently formed corporation, was negotiating with the Baltimore & Ohio Railroad Company for the purchase of car float No. 22, Hampton Roads' first piece of equipment. In the course of the negotiations for the purchase of the car float, David H. Batchelder Jr., president of and attorney for Hampton Roads, was told that he might be able to place insurance through Sullivan with whom Hampton Roads had never dealt before. On January 6, 1956 in a telephone conversation[2] between Batchelder in Norfolk, and Sullivan in Baltimore, Batchelder told Sullivan that he would like to get "full marine coverage" on the car float. Sullivan said that it was unable to write this type of coverage. Batchelder testified that he then said that he understood Sullivan could write a "total loss policy" and he believed that Sullivan answered in the affirmative. Batchelder further testified that he remarked that the car float was intended for use on inland waters and that if any damage were sustained, it was probable that the repairs would exceed the value of the repaired car float.

Sullivan's testimony as to the conversation was not identical with the testimony of Batchelder; but both are in agreement that only the words "total

---

1. Defendants did not claim surprise at, or formally object to such change in theory. The pleadings are accordingly treated as if amended to conform to the evidence. Fed.Rules Civ.Proc. rule 15(a) and (b), 28 U.S.C.A.; Stepp v. United States, 4 Cir., 1953, 207 F.2d 909, certiorari denied 1954, 347 U.S. 933, 74 S.Ct. 627, 98 L.Ed. 1084.

2. The testimony is not clear as to whether or not Batchelder called Sullivan or whether the call originated with Sullivan.

loss" were used on either side in the conversation as descriptive of the policy to be written, and there was no discussion of any "actual physical total loss" coverage.

Batchelder further testified that Sullivan agreed to cover the interest of Hampton Roads in the car float to the extent of $3,500, which Sullivan undertook to confirm by letter of the same day, the policy to follow later.

On January 6, 1956, Sullivan wrote to Batchelder, the letterhead reading "Boston Insurance Company Felix R. Sullivan, Jr. & Co., Inc. & Marine Agent". The text of the communication is as follows:

"In accordance with our telephone conversation of even date, also our talk with Mr. A. Rhodes Knight of the American Electric Welding Company, we beg to advise that we are binding $3500. Fire and Marine Coverage for *total loss only*, on the above Carfloat or Barge, at a rate of 3% per annum, with limits of Chesapeake Bay and inland waterways not beyond Jacksonville, Florida, as I understand from Mr. Knight that the transfer of same to your ownership takes place today.

"You can, therefore, consider this binder of the Boston Insurance Company, against *Total Loss conditions only*, and we will forward the policy to you as soon as same is written up.

"Thanking you very much for allowing us to handle this insurance for you and hoping to have the policy in your possession in the next few days, I am * * *." [3]

On January 11, 1956, Sullivan sent to Batchelder the policy in suit, the letter of transmittal reading as follows:

"In accordance with telephone conversation of the 6th instant, we now take pleasure in enclosing herewith TOTAL LOSS ONLY [4] Fire and Marine Policy No. 446813, Boston Insurance Company, for $3500. on the above Car Float, at the rate of 3%, for one year from the 6th instant, and you will note that we have given navigation limits of the Chesapeake Bay and inland waterways not south of Jacksonville, Florida, which I think covers the situation, as you stated she would be working mainly between Charleston and Norfolk.

"In the original survey of Captain F. W. Schilpp, I understand he recommended that she be towed by a Tug of at least 200 H. P., so I presume you are familiar with this as the survey was made through Mr. A. Rhodes Knight of the American Electric Welding Company, who undoubtedly sent you a copy of Captain Schilpp's survey.

"We thank you very much for allowing us to handle the enclosed for you and presume the American Electric Welding Company will have Builders' Risk Insurance on the twelve or fourteen Barges which they will build for you, if not, I would certainly take this under consideration.

"Hoping you will be good enough to let us have an opportunity to bid on the insurance on the new Barges, as they are completed by Mr. Knight's Company, I am".

On the first page of the policy there appeared, underlined in purple, the following: "* * * this policy only covers against absolute physical total loss of the insured vessel * * *." In the fine print on the back of the policy, the following provisions are found:

"There shall be no constructive total loss under this policy * * *.

* * * * * *

"It is a condition of this insurance that any broker, person, firm or corporation who shall procure this

---

3. Emphasis supplied.

4. Emphasis by capital letters in the original.

insurance to be taken by these Insurers shall be deemed to be exclusively the agent of the Assured in any and all transactions and representations relating to this insurance, and that any notice which these Insurers may give to such broker shall be deemed to have been given to the Assured, who hereby appoints said broker his, its or their agent for that purpose and the other purposes aforesaid."

Batchelder testified that on receipt of the forwarding letter and the policy,[5] he examined the policy only to determine that car float No. 22 was covered and that the territorial limits included the Chesapeake Bay and inland waterways not south of Jacksonville, Florida, which language appears in the upper third of the rider attached to the first page of the policy.[6]

The premium of $105.00 was paid on either January 18 or January 19, 1956. The car float was towed to the Santee River, South Carolina, within the navigational limits of the policy. On January 26, 1956, it became hung up on pilings with the falling of the tide and was badly damaged. A claim was promptly made under the policy but liability was denied. A survey was made on behalf of Boston and the surveyor reported a constructive total loss since the cost of repairs would exceed the value of the float after repair. He also found that the cost of raising and repair would equal or exceed $3,500, the face amount of the policy. Hampton Roads tendered abandonment to Boston, which refused tender on the ground that the loss was not one covered by the policy. The car float was later sold "as is" for $350.

■■ The parties are in agreement and the court finds that "total loss only" coverage would include a constructive total loss, and that constructive total loss occurs where the vessel has lost its identity and utility or where the cost of repairs exceeds the repaired value. 42 Words and Phrases, Total Loss, pages 94–95, 97–99; 45 C.J.S., Insurance, § 954, p. 1148; Marine Ins. Co. of Alexandria v. Tucker, 1806, 3 Cranch 357, 7 U.S. 357, 2 L.Ed. 466; Patapsco Insurance Co. v. Southgate, 1831, 5 Pet. 604, 30 U.S. 604, 8 L.Ed. 243; St. Paul Fire & Marine Insurance Co. v. Beacham, 1916, 128 Md. 414, 417–418, 97 A. 708, L.R.A.1916F, 1168; Monroe v. British & Foreign Insurance Co., 1 Cir., 1892, 52 F. 777; Couch on Insurance, Sec. 1709; Arnould on Marine Insurance (13 Ed. 1950), p. 995. "Absolute physical total loss" or "absolute total loss" excludes a constructive total loss.[7] Sullivan testified that when in the conversation with Batchelder, the words "total loss" were used, Sullivan meant "actual physical total loss" and that Sullivan had no intention or authority to write a loss policy except for actual physical total loss; that the policy which was sent was the policy Sullivan intended to send, and the premium charged was the premium applicable to actual physical total loss coverage. This is, of course, difficult to reconcile with the language in the binder agreement of January 6, 1956 and with the capitalization of the words "total loss only" in the forwarding letter of January 11, 1956. It is also difficult to reconcile with Sullivan's testimony that at the time of this telephone conversation, it had some question as to whether or not the car float might slip into deep water in Baltimore Harbor

5. Received on January 12 or January 13, 1956.

6. It is difficult to understand how Batchelder's eyes could have kept from following down the page and seeing the underlined language. On the other hand, it is at least equally incredible that had he, in fact, observed the limited coverage, he would not at once have realized that it was not the coverage desired, particularly since he had been engaged in the practice of admiralty law since 1949.

7. "Absolute" as used in either of these phrases means that the vessel is completely destroyed or has sunk in waters too deep to permit refloating. See cases supra.

and become a "constructive total loss". Sullivan might well have contemplated that Hampton Roads would wish to receive protection against such potentiality. Sullivan might also have realized that in the relatively shallow inland waterways, the chance that the vessel would become an absolute total loss was relatively slight, while the possibility of a constructive total loss was very real.

No evidence of any correspondence between Sullivan and Boston was offered. Sullivan testified that the policy in suit was prepared in Boston, Massachusetts, and sent to Sullivan in Baltimore where it was counter-signed by Sullivan.

Under these circumstances, the court denied the motion by Hampton Roads to reform the policy so as to hold Boston liable for a "total loss only" coverage. At the time of the conversations on January 6, 1956, Batchelder did not know with what company the policy would be placed; there is no evidence that Boston intended to write any policy other than that which, in fact, was delivered to Batchelder; and the policy made Sullivan the agent of Hampton Roads. Further, the court considered that the failure of Batchelder on behalf of Hampton Roads, to read the policy which clearly stated the coverage and made Sullivan the agent of Hampton Roads, and the reliance of Batchelder on his conversations with Sullivan and the representations in Sullivan's letters of January 6 and January 11, 1956, estopped Hampton Roads from obtaining a reformation of the policy, and relieved Boston of liability other than that expressed in the policy.

A different problem, however, is presented with respect to Sullivan, which may be held liable either for misrepresentation of its authority; or for negligence either as agent jointly for Boston and Hampton Roads or agent exclusively for Hampton Roads in failing to obtain the coverage requested by and promised to Hampton Roads.

At the trial, Sullivan testified, and in their answer the defendants alleged, that Sullivan had no authority to issue a marine loss policy except for "actual total physical loss".[8] No intimation of this limitation occurred in the conversations on January 6, 1956, in the binder letter of the same date, or in the letter of transmittal of January 11.

The court finds as a fact that Batchelder at the conclusion of the telephone conversations on January 6, 1956, and from the binder letter of the same date and the transmittal letter of Janaury 11, 1956, understood that Sullivan had undertaken to secure for Hampton Roads a total loss only policy; and concludes as a matter of law that under the circumstances such understanding was a reasonable one.

Therefore, even if Sullivan were, as it (somewhat inconsistently) contends, an agent for a disclosed principal, it could not escape liability; for such an agent is personally liable for breach of an implied warranty of authority. Burkhouse v. Duke, 1948, 190 Md. 44, 46, 57 A.2d 333; 1 Poe, Pleading (5 Ed.) sec. 362, pp. 332–333; A.L.I. Restatement, Agency, sec. 329.

There is no evidence that at any time before or during the conversation of January 6, 1956, Batchelder knew what company or companies Sullivan represented. This circumstance, together with the policy provision that the broker

---

8. Sullivan's testimony is strongly indicative of realization of the difference between a constructive total loss and an actual (literal) total loss, but is completely unsatisfactory on the question of whether it appreciated the significance of the difference between the words "total loss only" and "absolute physical total loss." Its witness testified that when he called Boston about the policy he referred to "total loss coverage"; that this was the only "total loss policy we had ever issued"; that in 50 years Sullivan had never written a marine "total loss only" policy "except this one"; and that when in the transmittal letter of January 11, 1956, he wrote "TOTAL LOSS ONLY" he meant "absolute physical total loss."

or other person procuring the insurance should be deemed to be "exclusively the Agent of the Assured" strongly supports, if it does not require, the conclusion that Sullivan was acting as agent for Hampton Roads[9] in securing insurance.

An insurance agent who undertakes to secure a specified coverage is liable in damages to the applicant for failure to procure such insurance, and this liability extends to negligence as a result of which the specified risk is not included in the policy. 16 Appleman, Insurance Law and Practice, 1944 Edition, sec. 8831, p. 272; 2 Couch, Insurance, sec. 463, pp. 1320–1321; Journal Co. v. General Acc., Fire & Life Assur. Corp., 1925, 188 Wis. 140, 205 N.W. 800, 804; see also Redmond v. Petty Motor Co., 1952, 121 Utah 370, 242 P.2d 302; Kroeger v. Pitcairn, 1882, 101 Pa. 311, 316, 47 Am.Rep. 718; Brawner v. Welfare Finance Corp., Ohio App.1950, 104 N.E. 2d 203, 206.

In such cases the general rule is that the insured is entitled to rely upon the agent having performed his duty, and is not denied recovery because he (the insured) failed to read the policy and discover the error or omission. Such failure by the insured is ineffective as a bar, either upon a theory of estoppel or "contributory negligence". Cooley's Briefs on Insurance (2 Ed.) 940 et seq.; McMaster v. New York Life Ins. Co., 1901, 183 U.S. 25, 39, 22 S.Ct. 10, 46 L.Ed. 64; McElroy v. British America Assurance Co., 9 Cir., 1899, 94 F. 990, 1000, certiorari denied 1899, 175 U.S. 728, 20 S.Ct. 1024, 44 L.Ed. 340; Home Insurance Co. of New York v. Sullivan Machinery Co., 10 Cir., 1933, 64 F.2d 765, 767, certiorari denied 1933, 290 U. S. 633, 54 S.Ct. 51, 78 L.Ed. 551; California Reclamation Co. v. New Zealand Ins. Co., 1913, 23 Cal.App. 611, 138 P. 960. The authorities are well summarized in Annotation, "Duty and liability of insurance broker or agent to insured with respect to procurement, continuance, terms, and coverage of insurance policies", 29 A.L.R.2d 171, 196:

> "If an insurance agent or broker has failed to procure a policy which in terms and coverage is of the type specified by the insured, and the insured consequently suffers an uninsured loss, the agent or broker cannot successfully contend that he is relieved of liability by reason of any contributory negligence on the part of the insured in having not read and familiarized himself with the contents of the policy."

The English rule appears to be similar. Arnould on Marine Insurance (13 Ed., 1950) 160:

> "Moreover, when a broker of repute is employed to effect an insurance against certain risks, the client is entitled to rely upon his instructions being properly carried out. It is no answer for the broker to say: 'I handed you the policy and you should have examined it and seen whether it gave you the protection you required.' A broker was instructed to insure goods per steamship Suwa Maru and/or steamers, but by a mistake insured them only while on the Suwa Maru. The policy was sent to the client, who did not examine it, though if he had done so the mistake should have been discovered. The goods were shipped on another steamer and were lost; but as they were only covered while on the Suwa Maru, the loss was not recoverable under the policy. It was held that the

---

9. The remaining alternative is that Sullivan was acting as agent for both Hampton Roads and Boston. The possibility of dual agency, and its propriety where there is good faith, no conflict of interest, and due authority from both principals, is well recognized. Home Insurance Co. v. Campbell Mfg. Co., 4 Cir., 1935, 79 F. 2d 588, 590; Sun Insurance Office v. Mallick, 1931, 160 Md. 71, 82, 153 A. 35; American Eagle Fire Ins. Co. v. Burdine, 10 Cir., 1952, 200 F.2d 26, 30. It is not seen, however, how such a relationship, even if it existed, would relieve Sullivan of the duty of due care, to either, or both, of the principals.

broker was liable for the value of the goods as damages for breach of his contract to insure them as directed. 'Business could not be carried on', said the learned Judge, 'if, when a person has been employed to use care and skill with regard to a matter, the employer is bound to use his own care and skill to see whether the person employed has done what he was employed to do.' "

For the foregoing reasons, which are intended to constitute findings of fact and conclusions of law, whether or not so expressly designated, let judgment be entered in favor of the defendant Boston Insurance Company, and against the defendant Felix R. Sullivan & Co., Inc., in the amount of $3,150 (being the amount of coverage, $3500, which should have been obtained by said defendant for the plaintiff, less salvage of $350) with costs, and interest from January 4, 1957.[10] Defendant's motion for a new trial is denied.

10. Date of the court's oral opinion.