Putnam, Circuit Judge.
In North Pennsylvania R. Co. v Commercial Nat. Bank, 123 U. S. 727, 733, 8 Sup. Ct. Rep. 266, the supreme court said as follows:
“There is no doubt of the power of the circuit court to direct a verdict for the plaintiff upon the evidence presented in a cause where it is clear that he is entitled to recover, and no matter affecting his claim is left in doubt to be determined by the jury. Such a direction is eminently proper, when it would be the duty of the court to set aside a different verdict if one were rendered. It would be an idle proceeding to submit the evidence to the jury, when they could justly find only in one way.”
In Railroad Co. v. Converse, 139 U. S. 469,11 Sup. Ct. Rep. 569, this was affirmed. The court, page 472, 139 U. S., and page 570, 11 Sup. Ct. Rep., said:
“But'it is well settled that the court may withdraw a case from them altogether, and direct a verdict for the plaintiff or the defendant, as the one or the other may be proper, where the evidence is undisputed or is of such conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set aside a verdict returned in opposition to it.”
In Railway Co. v. Cox, 145 U. S. 593, 606, 12 Sup. Ct. Rep. 905, the court said:
“The ease should not have been withdrawn from the jury unless the conclusion followed, as matter of law, that no recovery could be had upon any view which could be properly taken of the facts the evidence tended to establish.”
Although this did not state in terms that a verdict might be directed for either party whenever the court would be compelled to set aside one returned the other way, yet in view of the above citations, and especially in view of the expression in the yet later case, (Meehan v. Valentine, 145 U. S. 611, 618,12 Sup. Ct. Rep. 972,) it cannot be questioned that this test is still a proper one. Courts cannot be expected to stultify themselves by taking verdicts which in a sound judicial discretion they should immediately set aside. Applying this to the cases at bar, the direction of the court below to return a verdict for each defendant must be sustained.
*788 The plaintiff pnt in conversations with Endicott & Macomber, thi agents of the defendants, and claimed that as the result of them the defendants had accepted a total loss, or were estopped from disputing it. The court, however, regards these conversations as irrelevant. They took place at Boston, part on the day of the wreck and the remainder within a daj' or two after, necessarily in ignorance of the true condition of facts on the other side of the Atlantic, as plaintiff, of course, should have well understood; and they promised nothing except that everything “would be all right,” which was wholly indefinite. The plaintiff failed to prove that Endicott & Macomber had an agency so broad as to authorize them to adjust a loss of this nature occurring in England, where the defendant corporations were themselves present and had their habitat. Nothing is proven clearly, except that Endicott & Macomber had authority to issue the policies, receive the premiums, and represent the underwriters in legal proceedings taken in Massachusetts. If the plaintiff claims more than this he should have called out the agents’ powers of attorney or other written authority, or pointed out to the court some local statute clearly and specifically applicable. It is inadmissible to presume that local attorneys or agents have power to interfere with the adjustment of losses occurring abroad, especially in the country of the residence or domicile of the insuring corporations. To encourage a rule of that nature would be very unreasonable, in view of the fact that local agents rarely, if ever, have the knowledge necessary to enable them to deal with such matters.
It seems to the court that the question of the lack or existence of an abandonment is also of no consequence. The loss cannot be converted from a partial to a constructive total one with any effect in this case, and an abandonment has no use except for that purpose. This is sufficiently explained in Stringer v. Insurance Co., L. R. 4 Q. B. 676, and L. R. 5 Q. B. 599, approved in Cossman v. West, L. R. 13 App. Cas. 160.
Neither did jettison of the cattle create an absolute total loss. Whether they were jettisoned for the purpose of being saved, or to lighten the ship, is unimportant. Even derelict does not constitute an absolute total loss, if brought into a port of safety within a reasonable time, and if also the salvage charges are paid by the underwriters, or if under such circumstances that a prudent owner ought to pay them. Cossman v. West, ubi supra.
Carr v. Insurance Co., 109 N. Y. 505, 17 N. E. Rep. 369, cited by plaintiff, lays down the following rule:
“The underwriters having elected to take possession of the vessel under the rescue clause, it is plain, we think, that they could neither sell the vessel voluntarily nor permit it to be sold under judicial process in satisfaction of a lien which they had created, without thereby making the loss to the plaintiff an ‘ actual total loss,’ whatever may have been its original character.”
This divides into two branches:
First. A voluntary sale of the vessel by the underwriters. Undoubtedly the underwriters may so deal with property in peril as to convert what otherwise would be a partial loss into an absolute total one, or so- *789 as to bar thej -iselves from denying that such a loss has accrued. But when the assured has obtained the benefit of a low premium by covering absolute total loss only, then in view thereof, and also in view of the fact that public policy requires that all interested should be encouraged to use the sale and labor or rescue clauses to the fullest extent, whatever may be done in that direction by the underwriters, as well as by the owners, in unintentional excess of power, should not be made a trap.
Second. As to the effect of permitting property to be sold under judicial process, Carr v. Insurance Co. does not seem to state all proper qualifications. When a vessel or other property is taken possession of by captors or salvors, of course the owner is dispossessed, at least for the time being, and, unless he can restore his possession by reasonable efforts, the loss becomes absolutely total; but he is bound to use such efforts. In Carr v. Insurance Co. the vessel was in fact sold for a much less sum than the amount the underwriters agreed to pay the wreckers, so that a prudent owner would not have interfered to prevent a sale. And, inasmuch as the underwriters did not return the wreck free from salvors’ liens, the misfortune was, as a matter of fact, converted into an absolute total loss. So in Cossman v. West, ubi supra, the property saved was of less value than the salvage services, and the underwriters did not discharge the lien. The fact must appear that the sale was under such circumstances that a prudent owner would not interfere to prevent it. In short, if the property passes into the possession of captors or salvors, and the owners are thus in fact dispossessed, the loss becomes total, provided the owners cannot in either case recover the possession except by disproportionate exertions, expense, or hazard; otherwise it does not.
It is plain that in the case at bar the underwriters properly asked the intervention of salvors. The vessel and property aboard were in such condition that it was beyond the power of the master, owners, or underwriters to rescue her or her cargo, and the aid of salvors was necessary. Although the salvors were employed at the outset by the underwriters, and although they constituted an association in which the underwriters had shares or other interests, yet after their employment they ceased to be agents of the underwriters, and took and held possession in their own right for the benefit of whom it might concern. They did not differ in this respect from other salvors whose position and rights remain generally the same, whether they come to the assistance of a wreck as volunteers or at the request of the interests concerned. Having thus taken possession, it must, for the purposes of this writ of error, be conceded in behalf of the plaintiff that the salvors sent the cattle to Liverpool or Birkenhead, consigning them to themselves, and ordered them sold by James Nelson & Sons; that though this firm were the consignees the sale was for the benefit of the salvors and on their account; that, according to Nelson’s statement, the salvors declined to give them up; and that they did not ask anybody’s consent to the sale. Also it is true that the written employment of the salvors, though perhaps signed by *790 one of the underwriters after the rescued cattle were sold, really tool effect from its date, and before they arrived at Birkenhead or Liverpool, and that it authorized the salvors to sell in order to effectuate their lien; and it may be that, if it had been made to appear that they did sell for that purpose, and that the underwriters had no lawful right to thus empower them, the result would have been a conversion authorized by the underwriters, sufficient to bar them from denying an absolute total loss.
For the reasons already stated, it rested on the plaintiff to show this, or that the sale of the cattle could not have been prevented by him with due diligence. But he has not even put in evidence the written directions from the salvors to James Nelson & Sons to make the sale, nor shown for what reason the sale was made, nor when it took place, nor how much time intervened after the arrival of the cattle at Liverpool or Birkenhead. Neither has he made to appear whether any salvage was claimed, or, if claimed, what the amount was, or that it was tendered or offered, or that the salvors were told that the plaintiff or his consignees would pay it, or would pay what was justly due: The statement of the witness Nelson, that the salvors declined to give up the cattle, was too general to be strictly admissible as evidence, and, being unsupported by detail, has no weight, although the point of its admissibility was not raised. On the other hand, it does appear beyond question that part of the consignment did arrive at Birkenhead, which, as well as Liverpool, was a place of delivery under the bill of lading. It also appears that the plaintiff was not unrepresented there, because James Nelson & Sons were his consignees and had the bill of lading; and, although the witness Nelson protests that they did nothing on account of their consignor, yet they were in position to act. It was also his duty not to be unrepresented.
On the whole, if the plaintiff claims to bring himself within the exceptional rule of Cossman v. West, ubi supra, and to excuse himself from the general principles stated in Thornely v. Hebson, 2 Barn. & Aid. 513, it was for him to bring out all the facts necessary therefor. As part of the cattle arrived at Birkenhead, an absolute total loss cannot be made out, unless, as already said, the plaintiff shows that the underwriters directed an unauthorized sale, or that, with due diligence, he could not have discharged the claim of the salvors, and thus secured the remnants of the consignment. On important elements making essential parts of this proposition, he has failed to furnish any proofs; and on that account the circuit court would unavoidably have set aside a verdict in his favor upon this necessary branch of his case.
The point taken by the plaintiff, that no notice was sent him of an intention to sell the cattle, is not valid, inasmuch as his consignees actually sold them, and therefore knew they were to be sold. The further proposition, that the sale was a legal or physical necessity, is also ineffectual; because the record fails to show that there was not sufficient time and opportunity to. discharge the lien of the salvors, and take possession of the cattle, before the time of any necessary sale could arrive. *791 In this respect the conditions were essentially unlike those which appeared in Bondrett v. Hentigg, Holt, N. P. 149, where the goods were stolen on a barbarous coast; for, in the cases at bar, the courts and laws were in the same full vigor where the property arrived as in the United States, and presumably the consignees had opportunity for enforcing all legal rights.
On the whole, the suits turn on the circumstances of the sale at Birkenhead or Liverpool of the remnants of the consignment. The rules applied by us are elaborated in Arnold on Marine Insurance, (6th Eng. Ed.) in the opening of chapter 6. and in chapter 7, vol. 2, pp. 951, 952, and page 988 and sequence, and are reinforced by the conclusions in Thorndy v. Hebson, ubi supra. The' expression of Lord Tenterden (Abbott, C. J.) in this case is very apt: o
“If, in this case, it had appeared that the owners had used all the means in their power, and were still unable to have paid this salvage, it would have been very different; but that is not so, and I am therefore of opinion that the assured is not entitled to recover for a total loss. ”
Copelin v. Insurance Co., 9 Wall. 461; Richelieu & O. Nav. Co. v. Boston Marine Ins. Co., 136 U. S. 408, 10 Sup. Ct. Rep. 934; and Shepherd v. Henderson, L. R. 7 App. Cas. 49,—cited by the plaintiff,—reiterate, for the sake of applying them to the pending facts, rules of law fundamental and well known as applicable to abandonments under policies which cover constructive total losses, but have no close relation to the suits at bar.
We understand the proposition that the policies should be treated as effecting a separate insurance for each head of cattle, so that the loss of any one created a claim against the underwriters for an absolute total loss so far as that one was concerned, is not now insisted on.
The judgment of the court below in each case is affirmed.