## McPECK v. CENTRAL VT. R. CO.

### (Circuit Court of Appeals, First Circuit. March 23, 1897.)

### No. 187.

1. TRIAL—DIRECTION OF VERDICT.
   The rule applied that a verdict may be directed for defendant on a mere question of fact when the proofs are insufficient to support a verdict for plaintiff if he should recover one.

2. MASTER AND SERVANT—FAILURE OF MASTER TO REPAIR.
   Where a servant of a railroad company was injured as the result of a defect in the management of trains, the fact that he had given notice of the defect does not relieve him of the risk he assumed in entering the service, when fully 20 days elapsed between his complaint and the injury without any change having been made in the methods of the company, and this fact was known to him.

3. FELLOW SERVANTS.
   The foreman of a gang of railroad track builders and the engineer of a train are fellow servants, and the master is not liable for an injury to one by the negligence of the other.

4. SAME—CONTRIBUTORY NEGLIGENCE.
   The rule that the contributory negligence of the party injured will not defeat the action if it be shown that the defendant might, by the exercise of reasonable care, have avoided the consequences of such negligence, or that

the act of the defendant was willful, has no application to an action against the master to recover damages for an injury to one of two fellow servants by the negligence or willful act of the other, where the master had no such notice of the plaintiff's supposed negligence, or of the alleged willfulness, that he could guard against them.

In Error to the Circuit Court of the United States for the District of Massachusetts.

This was an action by Henry McPeck against the Central Vermont Railroad Company to recover damages for personal injuries. The court directed a verdict for defendant, and plaintiff sued out' a writ of error.

Barron C. Moulton and Victor J. Loring, for plaintiff in error.

Chester W. Witters and Forrest C. Manchester, for defendant in error.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

PUTNAM, Circuit Judge. No controversy has arisen as to the pleadings in this case, and therefore it is not to be inferred that we either approve them or disapprove them.

The case was opened to a jury in the circuit court, and, at the close of the evidence in behalf of the plaintiff, that court, on the motion of the defendant, directed a verdict for it. The plaintiff duly excepted, and sued out this writ of error. He assumes that the ruling below was necessarily erroneous unless it involved a "matter of law" or a "conclusion of law." This is a mistaken assumption. A verdict may thus be directed on a pure issue of law raised by the parties, or, which may be substantially the same thing, on an application of the law to admitted facts, or on a mere question of fact when the proofs are insufficient to support a verdict. As was said by us in De Loriea v. Whitney, 11 C. C. A. 355, 361, 63 Fed. 611, 617:

"When a verdict in one direction ought to be set aside as against the weight of evidence, then, under the rule as now understood, the court ought to direct a verdict in the other direction."

The time has gone by when the federal courts sit, at their own loss of time, and at the expense of the parties, to take verdicts which they can foresee ought not to have been taken. Meehan v. Valentine, 145 U. S. 611, 618, 12 Sup. Ct. 972; Railroad Co. v. Gentry, 163 U. S. 353, 365, 16 Sup. Ct. 1104; Monroe v. Insurance Co., 3 C. C. A. 280, 52 Fed. 777, 787.

The case of the plaintiff in error, as stated by him, is as follows:

"This was an action of tort for injuries received June 9, 1893, on the defendant's railroad, between St. Albans and Swanton Junction, Vermont, between seven and eight o'clock in the morning. It appeared in evidence that plaintiff was in the employ of the defendant, and was foreman of a gang of Italians, and employed with them in building a new track west of the old track going north from St. Albans. On the morning of the 9th day of June, the plaintiff was ordered to clean the dirt from the ends of the ties on the old track, on the east side of the roadbed, in order that the new rails might be laid thereon near Jewett's Crossing, a public highway about three miles north of St. Albans; and in order to show the Italians with him how to shovel

the dirt from the ties, as he could not speak Italian, and the Italians could not speak English, he got a shovel, and facing towards the north, with his back towards St. Albans, lifted and threw a shovelful of dirt from the ties; then looked back towards the south, in the direction of St. Albans, to see if the train was coming, and, seeing no train coming, took another shovelful, and, while in the latter act, was struck. No signal by bell or whistle, or otherwise, was given on that train, although it was downgrade from St. Albans to the place of injury, and the railroad crossed five highways at grade, went round quite a curve, where bushes and telegraph poles prevented plaintiff from seeing the approach of it before it struck the plaintiff. No signal was given to warn the plaintiff, nor even the brakes applied, nor was the train slowed up until after the engine struck the plaintiff. The train was running at the rate of from thirty to forty miles an hour. The engineer could see the plaintiff at a distance of eight or nine hundred feet, or more. This train had frequently, prior to this date, failed to give proper signals of warning to men upon the track and at the crossing, and had killed one man. The plaintiff had known of three instances where signals were not given, and had complained to the road master twice in regard to the absence of signals, and that, in running trains, the signals were not given, as required by the rules of the road and the laws of Vermont. The road master, the first time, said he would regulate it, but the second time he said 'ringing the bells and blowing the whistles was all a farce.' "

The first complaint was made about the 15th or 20th of May. The second complaint was made in June, just before the plaintiff was hurt. Plaintiff supposed from the first answer that the neglect would be corrected, but he claims he did not understand what was meant by the second. The plaintiff had had several years' experience at railroad work in various capacities, and was in good health, and not lacking in the ordinary intelligence suiting him to the position of oversight and control which he held. The train in question was made up at St. Albans, and had for some time been irregular as to its time of starting, as the plaintiff knew; and it was 12 minutes late the morning of the injury. That morning the plaintiff commenced work on the track before the due time of the train to pass; so he had undoubted opportunity to know whether it had passed or not. Indeed, according to his own testimony, he must be presumed to know that it had not passed. His testimony as to his conversations with the road master, as given in his direct examination, was as follows:

"Q. Whether or not you made any complaint to any official of the road or to the road master in regard to this absence of signals to which you have just testified? A. I did, to Mr. Shanks. Q. Mr. Shanks was the road master? A. Road master. Q. What did Mr. Shanks say to you? A. He said he would see that things would be altered, and that they would run according to time. Q. What did you say to Mr. Shanks? A. I told him they come near killing one of my Italians; that I couldn't understand them, nor they me. Consequently, they came near killing one of them at that time, and one they did kill. Q. Whether or not you told him of the absence of these signals? A. Yes, sir; I did. Q. What did he say? The Court: He has answered that. Mr. Loring: I didn't understand. The Court: He told him he would regulate it. Q. How long before this time you were hurt was this that you made this complaint to Mr. Shanks? A. It was somewhere along, I should think, between the fifteenth or twentieth day of May that I first talked with him about it. I talked a second time, understand, with Mr. Shanks, about this business, and he told me in reply that— Q. Now, Mr. McPeck, when did you first notice any absence of any signals on this particular train? A. When did I what? Q. First notice absence of signals. A. Well, it was along about the fifteenth or twentieth of May, I should think, that I first noticed these

things.  Q. You were about to state what Mr. Shanks said in answer to your second complaint.  A. He told me that blowing the whistle and ringing the bell had got to be all a farce now.  That was what he told me.  That was the reply I got."

In reply to interrogatories by the court, he testified further in regard to this matter, as follows:

"Q. Then you knew at that time that the place—  Your statement is that you knew at the time that they failed to whistle for these crossings?  A. Yes, sir.  Q. And you complained to Mr.—  A. Shanks.  Q. To Mr. Shanks.  Well, and he replied that this matter of whistling and ringing of bells was all a farce?  A. He stated it was all played out now; it was all a farce.  That was the words and substance he said to me.  Q. Did he say anything further?  A. No, sir; that was the last words he said.  Q. Now, what did you understand he meant by that?  A. What he understood?  Oh, yes, your honor, he said the road had a charter to run, and it made no difference whether they used a bell or whistle.  He said the road had a charter to run, and it made no difference whether or not they used a bell or whistle.  Q. What did you understand he was going to do?  That he was going to regulate it, or that he was not?  A. At first I did, and the last time I thought he was careless when he did it.  Q. You say, when he spoke about the regulating of the trains, he was going to do it, but, when you complained the second time that the men failed to whistle, he said it was all a farce?  A. Yes, your honor, that is the words.  Q. Did you understand that he was going to require the engineer to whistle, or that he was going to let it run along as it had run?  A. I couldn't, your honor, say what he meant by it, because that was the words passed.  I couldn't, your honor, understand what he said by the words.  He said the company had a charter to run the road, and the blowing of the whistle and the ringing of the bell were all played out and all a farce.  Q. Played out and all a farce?  A. That was the words.  Q. Now, what was your understanding as to what he meant by that?  A. Your honor, I couldn't take any meaning by the word that I could see was right or wrong; only just listen to it.  Q. Did you understand that he was going to regulate it?  A. I understood so the first time.  Q. I mean the second time.  A. Your honor, I didn't pay much attention to what he said the last time.  Q. You at that time were in good health?  A. Yes, sir.  Q. When he told you that they had a right to run the road, and that the matter of whistling and ringing bells at the crossing was all a farce, why didn't you quit work?  A. That is where I was wrong, I suppose.  I suppose he was always—  Q. Did you make any reply to him?  A. No; none at all."

He gave some further testimony on this point, but nothing which we can see tends to strengthen his position.

The plaintiff claims that he was entitled to go to the jury on the questions whether or not the road-master's second answer was equivocal or evasive, whether or not he was misled thereby, and whether or not, in view thereof, he could be held to have assumed the risks of the case.  But, as the record shows no circumstances to support such contentions, it is plain the jury would not have been justified in finding in his favor on any of them.

The case is wholly unlike Railroad Co. v. Babcock, 154 U. S. 190, 200, 14 Sup. Ct. 978.  In that case some delay had elapsed between the time when the person employed gave notice of the defect and the time of the injury; but he had had no reasonable opportunity to ascertain whether repairs had been made, and was himself guilty of no negligence.  But here fully 20 days elapsed between the first complaint and the injury; yet no change in the methods of the defendant corporation or in the management of its trains had been made, and the plaintiff knew this.  Hough v. Rail-

way Co., 100 U. S. 213, 225; Bevan, Neg. (2d Ed.) 756. Besides, the
second conversation with the road master put him on his guard,
and was equivalent to a notice that he could not rely on any relief.

The presiding judge prefaced his ruling with a statement of his
reasons therefor, the essential portions of which were as follows:

"It does not seem to me to be necessary to consider all the questions raised
by the grounds stated in the defendant's motion. It has not been suggested
in argument, and I do not recall any evidence tending to show, that the road-
bed on which the plaintiff was employed was unsafe or dangerous: and the act
of negligence which the plaintiff claims to have caused the injury was the
failure of the train which left St. Albans northbound, about 7:30 a. m., to
signal its approach by whistling, or ringing a bell, at the highway crossings
between St. Albans and the point where the plaintiff was injured.    The evi-
dence of the plaintiff tends to show that there were three or more street and
highway crossings, the last being something like 60 feet south of the point
where the plaintiff was at work, and that the crossing signals were not given
at any of these places.

"In respect to this situation, the plaintiff claims, first, that the injury resulted
from the omission of the engineer to blow the whistle or ring the bell on
this particular morning, which care and prudence required him to do, and
that the defendant is responsible for such want of care on the part of its en-
gineer.  Assuming, as we must for the purpose of disposing of this motion,
that the signal was not given, we must treat it as an omission or want of
care of a fellow servant, for which the defendant is not liable, upon the rea-
sons stated by the circuit court of appeals for this circuit in Railroad Co. v.
Hyde, 5 C. C. A. 461, 56 Fed. 188.    This doctrine proceeds upon the idea that
persons, when they enter upon perilous and hazardous employments, assume
the risk incident to the want of care of fellow servants.    So, it follows that,
if the injury resulted from the want of care of the engineer on this particular
occasion, it was caused by the carelessness of a fellow servant, and was not
an act for which the company can be held liable under the law as we are
bound to administer it.    Railroad Co. v. Hambly, 154 U. S. 349, 356, 357,
14 Sup. Ct. 983.

"The plaintiff claims, further, that the failure to signal the approach of trains
was habitual, and of so long standing that the defendant company either knew,
or ought to have known, that its servants on this particular train were failing
to perform their duty, and that the company was therefore liable, on the
ground that it continued in its employment improper and unsuitable servants.
Against the defendant's objection, the plaintiff was permitted to show that
on several occasions highway crossings in this locality were approached by
this train without giving the signals required by the statutes of Vermont and
by the rules of the road.    The defendant contends that the statutes and the
rules and regulations of the company in respect to highway crossings are for
the protection of the public who have occasion to use the highway in crossing
the railroad; that they have therefore no application to the case of an em-
ployé; while the plaintiff contends that the servants of the road have a right
to assume that the signals which the law and the rules and regulations of the
company require at highway crossings will be given, and that they may govern
themselves accordingly in the performance of their duty, and that, if injury is
sustained, they may invoke the aid of the statutes and rules in establishing
the right of recovery in their behalf.    At the time this evidence was received,
it was stated to counsel that its effect must be treated as an open question,
to be determined later on.    Now, without determining the effect of the stat-
utes, or of the rules or regulations, or the question of their applicability to
this case, if we assume (which is doubtful) that it was all matter on which
the plaintiff might rely for his protection, we are confronted with the fact
that the plaintiff, according to his own statement, had full knowledge that it
was not a signal on which he could in fact rely.    Therefore, if there was an
omission or want of care so habitual that the company either knew or ought
to have known the situation, it was a defect in management, or a want of
care, of which the plaintiff himself was fully advised; and under the doctrine
expressly held by the supreme court in Tuttle v. Railway, 122 U. S. 189, 7

Sup. Ct. 1166, the plaintiff, by continuing in the service, assumed the risk incident to such service and such management. As said by the supreme court in the case referred to, he continued in the employ of the defendant with a full knowledge of all these things,—the condition of the track, the character of the curves, the hazards incident to a management where, he says, the failure to give the crossing signals was habitual.

"I do not understand that counsel for the plaintiff contends against the application of this doctrine of assumption of risk to the plaintiff's case, in view of his knowledge of the situation, except to say that he is relieved from its operation by reason of a conversation with the road master. As to that, the plaintiff says he talked with the road master, and complained of the irregularity of the trains, as I understand it, in respect to the time of arrival, and he received assurance that such irregularity would be remedied; and that, at a subsequent conversation, he complained of a want of signals at crossings, and was informed by the road master that such signals were all a farce, and played out. The plaintiff, being an intelligent and vigorous man, in the prime of life, must have understood, if such conversation took place, that the road master, at least, did not intend to make any change, and that the old condition would continue. As is said in the Tuttle Case, everything was open and visible, and the employé had only to use his senses and his faculties to avoid the dangers to which he was exposed. It was his duty to look out for this, and avoid it. In that case there was no evidence of actual knowledge, but the court assumed that, as the defect in that case was open and visible, it must have been known to him. The knowledge was presumed, the employé being an experienced man; while, in the case we are now considering, actual knowledge of the dangerous condition is established by the plaintiff's admission. It must therefore he held that, by voluntarily continuing in the service, he assumed the risk incident to a fault of which he was full advised."

Looking, therefore, at the contentions of the plaintiff and the statements of the presiding judge, and without committing ourselves to the precise terms used, it is plain that the rules of law applicable were all well settled, as to which there could be no real controversy, and that they were correctly applied to a state of proofs which would not have supported a verdict for the plaintiff if he had recovered one.

Smith v. Baker [1891] App. Cas. 325, which relates to the question of the liability of an employer to his employé for continued carelessness in giving warnings, might perhaps be relied on to sustain the proposition that this case, in some of its aspects, should have gone to the jury; but the rule of Smith v. Baker is certainly not the rule of the federal courts. Moreover, an examination of the history of that case from its origin shows that the great weight of authority was contrary to the conclusion of the house of lords, reported as stated. In the house of lords the only lords concurring in holding the employer liable on account of the want of proper warnings were Lord Halsbury, L. C., Lord Hershell, and Lord Watson. On the other hand, the case, which, so far as the supreme court of judicature was concerned, commenced in the divisional court of the queen's bench division, went from there to the court of appeal, and from the court of appeal to the house of lords. The ruling in the divisional court was formal, but Mr. Justice Wills, as appears at page 343, expressed the opinion that the employé accepted the risk of the employment. In the court of appeal, Lord Coleridge, C. J., and Lord Justices Lindley and Lopes concurred in the views of Mr. Justice Wills; and in the house of lords Lord Bramwell and Lord Morris also concurred in those views, although

Lord Morris concurred in the result in the house of lords on the ground that, according to the verdict of the jury in the county court, the employer's machinery was not reasonably fit for its purpose, and the plaintiff below did not know that fact, also stating that, under the statute, no fact found by the jury was appealable. This gives a sum of six learned judges against the conclusions of the house of lords, and only three in its favor, with the weight of learning and experience averaging at least as favorably for the former as for the latter.

It is claimed that the case is governed by the local judicial decisions. We perceive no essential differences to result even if it were; but that, as to the mutual relations of master and servant, we are not controlled by such decisions, has been fully settled since Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914. Neither are we required to pass on the question whether the plaintiff had a right to rely on the course of business of the defendant corporation, as presumed to exist in consequence of the statutes and rules as to signals at public crossings.

The plaintiff also urges the rule announced in Coasting Co. v. Tolson, 139 U. S. 551, 11 Sup. Ct. 653, and again in Railway Co. v. Ives, 144 U. S. 408, 429, 12 Sup. Ct. 679, that the contributory negligence of the party injured will not defeat the action if it be shown that the defendant might, by the exercise of reasonable care, have avoided the consequences of such negligence; and he also claims that the conduct of the locomotive engineer of the defendant corporation was willful in running his locomotive knowingly against the plaintiff. Passing by the question whether these propositions were so urged at the trial that we can take jurisdiction of them, it is plain that there is nothing in them with which the defendant itself can be charged. It had no such notice of the plaintiff's supposed negligence or of the engineer's alleged willfulness that it could guard against them; and, as to each proposition, the condition is purely that of the relations of employés among themselves.

While it is true that under many circumstances a servant may, by giving notice of defects in machinery, or in the course of business, relieve himself from the risks which he ordinarily assumes, yet this relates more particularly to the question of the negligence of the employer; and the question of the contributory negligence of the servant, nevertheless, always remains to some extent. He cannot perhaps be charged with negligence merely because he continues in the service for a time not unreasonable after he gives the notice, but he is always bound to use reasonable care under all the circumstances known to him. The distinction is recognized in Hough v. Railway Co., 100 U. S. 213, 224, 225, already cited, and in Railroad Co. v. McDade, 135 U. S. 554, 570, 10 Sup. Ct. 1044. But, as stated by the learned judge who tried the cause, we have no occasion to determine its application here. The judgment of the circuit court is affirmed, with costs.