## LOWITT AND HARRY COHEN INSURANCE AGENCY, INC. *v.* PEARSALL CHEMICAL CORPORATION OF MARYLAND

[No. 156, September Term, 1965.]

*Decided April 21, 1966.*

The cause was argued before PRESCOTT, C. J., and HORNEY, MARBURY, OPPENHEIMER and BARNES, JJ.

*Benjamin Lipsitz,* with whom was *Philip O. Roach* on the brief, for Harry Cohen Insurance Agency, Inc., appellant; no brief filed for Monroe H. Lowitt, other appellant.

*W. Hamilton Whiteford,* with whom were *Louis G. Close, Jr.* and *Samuel J. Friedman* on the brief, for appellee.

PRESCOTT, C. J., delivered the opinion of the Court.

After judgments were entered against appellant, Harry Cohen Insurance Agency, Inc. (Cohen, also sometimes referred to as the appellant), on the ground that it had failed in fulfilling its duty owed to appellee as appellee's insurance broker, and the appellant Lowitt, as sub-broker, on the basis of wilful misrepresentation and fraudulent misconduct, they separately appealed.

Appellant Cohen makes two contentions: (1) it claims that the evidence was insufficient to sustain the judgment entered

against it; and (2) that the insurance policy involved, even had it been effective, would not have afforded the coverage claimed.

Harry Cohen, the president of Cohen, had been an insurance broker and an agent for insurance companies for a number of years. (It is noted at the outset that appellee makes no charge against Cohen of fraudulent misrepresentation or misconduct on its part, but specifically bases its (appellee's) claim against Cohen on the ground of negligence.) Appellee and its predecessors engaged in the business of manufacturing chemicals, and, for some years, appellee's insurance requirements had been handled by Cohen, in which it placed confidence and upon whom it relied for advice and guidance in matters pertaining to insurance. In 1959, appellee's public liability policy was about to expire. Cohen advised it that this policy could only be placed in a foreign company at a higher premium rate or surcharge, to which it agreed.

Thereafter, Chemical received a certificate which is extensively referred to in the testimony as a "cover note." A cover note is a document commonly used when insurance is placed with foreign companies and contains representations that the broker "has procured insurance" as therein specified from the insurers named therein. It is for all practical purposes a "binder" or certificate representing that insurance has been procured and that a policy by the insurer will follow at a later date. *K. C. v. Eureka,* 185 P. 2d 832 (Cal.). In the cover note involved in this case which Cohen delivered to Chemical in fulfillment of its agreement to procure a public liability policy, it was certified that insurance had been "procured * * * as herein specified from UNDERWRITERS at LONDON, ENGLAND, SUBJECT HOWEVER, in all respects to the terms, conditions and provisions of *Underwriters at London policy* heretofore or hereafter *issued by the said Underwriters * * *"* to which was affixed policy provisions usually found in insurance policies, and which bore the label of Cohen. The cover note was signed by General and Excess Underwriters, Inc. (General), another insurance broker from whom Cohen had obtained it.

In the upper right hand corner of the first page of the cover

note appeared a rubber stamp naming four insurance companies and opposite each company a percentage figure was set out, but no language was used obligating any of these insurers under the terms of the policy nor was Cohen able to explain the absence of such obligations, except to state that it was a requirement of the Maryland Insurance Department. However, this was denied by Mr. Melgard an official of that department. Chemical "felt confident" that this document was in fact an insurance policy which was issued by Lloyd's of London, covering the risks against which Cohen contracted to insure Chemical. Subsequent evidence disclosed that neither Lloyd's nor any of the insurers named in the rubber stamp had authorized the issuance of the policy on their behalf, except possibly Dorchester Insurance Co., Ltd., a company of questionable financial worth of which Lowitt was president and in which he and General had financial interests. Dorchester's financial difficulties shortly after the issuance of this cover note resulted in its liquidation in Jamaica. Cohen testified that he knew Lowitt "was one of the owners of it [Dorchester]."

While this cover note or policy was in force, Chemical engaged the services of Burns Detective Agency to trace and investigate a mysterious loss of raw materials from its plant. Burns assigned one of its men, a certain Coleman, to conduct the investigation. While so employed by Burns as a detective on the insured's premises, Coleman struck his head on an exposed valve stem, on September 12, 1960, but he continued to work for several days thereafter, and off and on for about three or four weeks after the incident. Coleman's work schedule was of an irregular nature and sometime later he "stopped work" for reasons which were never given to Chemical. On November 28, 1960, Burns assigned a new man to Chemical's plant, and according to witnesses produced by the appellants, no notice was ever given to Chemical of any claim by Coleman, or by anyone on his behalf, against Chemical.

Sometime in May or June of 1962, a third party action under the Workmen's Compensation Act was filed by Coleman, his employer and insurer against Chemical to recover substantial damages resulting from the injury, it being alleged therein that Coleman had been permanently disabled from a mental distur-

bance attributed to the head injury, and the insurer had settled the compensation claim for a sum in excess of $20,000, for which it sought subrogation. On the day on which service of the narr and writ was made by the sheriff on Chemical's resident agent in Maryland, Samuel J. Friedman, who was also its attorney, the latter, at the request of Chemical communicated with Cohen to confirm the insurance coverage and arrange for the delivery of the suit papers to the insurers for defense of the action. Cohen informed Freidman that Chemical was insured by Lloyd's of London against accidents of this nature and to forward all the papers to him in order that he could send them to the proper parties for the defense of the suit.

On June 22, 1962, the same day on which the papers were served on Friedman by the sheriff, he sent the writ and narr to Cohen with a covering letter confirming Cohen's statement that Chemical was insured by Lloyd's of London. On June 27, Cohen wrote to Friedman returning the suit papers with a letter from General to Cohen stating that the policy had been placed with Dorchester, which was being liquidated and since the damages claimed were in excess of the limits of the cover note, Chemical would have to participate in the defense of the action "to a larger degree than the insurer." Friedman communicated with General upon receipt of the letter and was informed that only Dorchester remained liable since the other three companies had cancelled the policy, but "due to an error on our (General's) part" notice of cancellation "was not sent out." Friedman then informed Cohen, General and Lowitt that, in his opinion, the failure of the companies to notify Chemical of the cancellation did not relieve them of responsibility under the policy. As a result of these discussions, Cohen informed Friedman that all the insurers would "assume liability under the terms of this policy."

Accordingly, the narr and writ were again sent to General by Friedman by his letter dated June 28, confirming this latest understanding, a copy of which letter was sent to Cohen. Thereafter, General called Friedman and advised him that all the insurers, except Dorchester, had recanted and refused to defend the action and accept any liability under the policy by reasons of the cancellation. Because of its error in failing to notify

Chemical, General offered to contribute towards any settlement of the Coleman suit and sent Friedman a check for $250 on account for counsel fees for the defense of the suit.

In view of these developments, Friedman began an investigation of the entire situation surrounding the issuance of the policy, as a result of which it was ascertained: (1) that there was no such entity as "Underwriters at London, England"; (2) that Dorchester was not an English company, but a Jamaican one; (3) that Lowitt was president of and a stockholder in both General and Dorchester; (4) that General never had authority to issue the cover note involved in this case; and (5) that the officers and stockholders of both General and Dorchester were the same persons.

Upon learning these facts, Chemical filed a complaint with the Insurance Commissioner of Maryland, who informed them that other complaints had been filed against General and that joint hearings would be held in the near future. At these hearings, Lowitt freely admitted that the use of the rubber stamp naming the four insurance companies was a "subterfuge." He also admitted that "at no time did it (General) have authority to issue certificates * * *" such as were issued in this case and that it had "no authority from any London company" to bind them. (Emphasis ours.) Lowitt further testified that the usual practice of brokers in issuing cover notes was to "submit details of the risk to our London broker and he comes back and says we have placed this risk with such and such companies and we would issue our cover note accordingly." However, General did not have such confirmation before it issued the cover note in this case to Chemical in which it was stated that the risk had been placed. The practice of confirming the risk before issuing the cover note was also testified to by Mr. Salladin, appellant's own witness. As to this relation with foreign companies, Lowitt admitted that "We never had binding authority we were not permitted to have. We were not their agent, only brokers." The purpose of these hearings was to consider the revocation of the brokers' licenses of General and Lowitt, and as a result of the hearings both licenses were permanently revoked.

Friedman kept Cohen fully informed of all developments and conversations with General and Lowitt. Mr. Cohen visited

Friedman on one or two occasions, and, during one visit, he made the following revealing remarks: "Mr. Friedman, you taught me something about insurance that I never knew before." "These cover notes that I have been using for some time, I thought I was getting insurance from Lloyd's of London. It turned out, it wasn't Lloyd's of London at all."

The evidence further discloses that Cohen on at least five occasions issued cover notes similar to the one involved herein, and when it reported the tax required to be paid on policies issued by unauthorized companies, it named Lloyd's of London as the insurer, when, in fact, Lloyd's was not the insurer. In six instances, when Cohen billed appellee for premiums due, the insurer was named as Lloyd's of London although the insurer named in the cover notes was "Underwriters at London, England."

Harry Cohen, president of appellant Cohen, cannot be said to have been a very impressive witness. At one point in his testimony in an effort to show that Cohen had fulfilled its duty to the appellee by checking the type and financial stability of the companies in which it had placed appellee's insurance, he stated that he had checked them in Best's Insurance Guide and "several other publications." However, when given a copy of Best's he was unable to show any of the companies named in the cover note listed therein, and he could not remember any of the "other publications." And, although he offered to "get them," none was ever produced during a trial which lasted several days. In addition, when it was called to his attention that under Maryland law an insurance company which is not authorized to do business in Maryland cannot have an agent in Maryland for the issuance of a policy in Maryland, he stated the subject policy was signed by John Winslow "in Philadelphia." "I think [he] was a resident of the State of Pennsylvania." "I said I think. In New Jersey, wherever he may have been a resident."

Appellants produced a witness whom they qualified as an experienced broker in surplus lines of insurance. However, when he reached the heart of our present inquiry on cross-examination, he stated that he would issue a cover note only upon receipt of a cable indicating that insurance *had been placed,* and

not before, as was done in the case at bar. In addition, he testified, "Sir, we [his company] would not issue a document saying 'Underwriters of London, England,'" explaining that his documents showed his company's capacity as a broker to procure insurance from a certain company or companies, whose participation "by percentage or by dollars amount" is shown, subject to the terms and conditions of a policy "heretofore or hereafter issued," or "wording somewhat similar to that."

## I

Appellant Cohen's first contention is two pronged, and we shall consider them in the reverse order in which they are presented by it.

### (a)

It claims the evidence is insufficient to establish that General and/or Lowitt were agents of Cohen in connection with the procurement of the cover note, so as to charge Cohen with responsibility for their activities. The question, we think, presents no serious problem. General was an insurance broker and it was necessarily Cohen's agent, when Cohen obtained the cover note from it, without authority from Chemical to do so. Chemical employed the services of Cohen, and placed confidence and trust in it as an experienced and knowledgeable insurance broker. Cohen violated this trust and confidence, when it, without permission, employed a sub-agent (or a sub-broker). *Groscup v. Downey,* 105 Md. 273; *Van Lill Co. v. Packing Company,* 155 Md. 303. And this is the general rule elsewhere. 1 *Mechem, Agency* (2 ed.), §§ 305, 306, 307; 12 C.J.S., *Brokers,* § 22. And a broker, which employs, without authority, a sub-broker, is responsible to the broker's principal for the defaults of the sub-broker. 3 Am. Jur. 2d, *Agency,* § 157; 12 C.J.S., *Brokers,* § 23; Restatement, *Agency* (2d), § 406; 61 A.L.R. 279; Cf. *Travlos v. Commercial Union of America,* 217 N. Y. S. 459; *Walker etc. v. Black,* 65 A. 799 (Pa.); *Harris v. A. P. Nichols Inv. Co.,* 25 S. W. 2d 484 (Mo.). The trial court was amply justified in finding that General was the agent of Cohen, and it was liable for General's defaults.

### (b)

Here, Cohen contends that the "evidence is not sufficient to

establish the standard of care reasonably to be expected from Cohen * * *." Its main argument seems to be that the degree of skill and diligence required of Cohen could only be established by expert testimony as to the degree of skill and diligence usually employed by brokers under circumstances similar to those surrounding the relationship between Cohen and Chemical, citing malpractice cases against physicians. We do not agree.

We shall accept the degree of care and skill suggested by Cohen in its brief, wherein it cites *Couch, Insurance 2d,* § 25 :37, as follows :

> "An agent, employed to effect insurance, must exercise such reasonable skill and ordinary diligence as may fairly be expected from a person in his profession or situation, in doing what is necessary to effect a policy, in seeing that it effectually covers the property to be insured, in selecting the insurer and so on."

However, we add thereto, the same author's section 481 of *Couch, Insurance,* wherein he states :

> "As a general rule, a broker or agent who, with a view to compensation for his services undertakes to procure insurance on the property of another, but fails to do so with reasonable diligence, and in the exercise of due care, or procures a void or defective policy * * * is personally liable to his principal for any damages resulting therefrom. In fact, a broker taking money to secure insurance, who unjustifiably fails to secure the same, or to make an effort to do so, becomes liable, in case of loss, to pay as much of the same as would have been covered by the policy had it been secured."

Judge Watkins stated the rule thus :

> "An insurance agent who undertakes to secure a specified coverage is liable in damages to the applicant for failure to procure such insurance, and this liability extends to negligence as a result of which the

specified risk is not included in the policy." *Hampton Roads v. Boston Ins. Co.,* 150 F. Supp. 338 (D. C. Md.).

One final quotation from Appleman, *Insurance Law & Practice,* § 8833:

> "Where insurance agents undertake to procure policies for individuals, they are bound to ascertain the responsibility of the company's issuing the policies, and to exercise reasonable diligence, and to make inquiries as to the companies whose policies they propose to deliver."

See also 22 Md. L. Rev. 82; *Mechem, Agency* (2d ed.), § 2370; 29 Am. Jur., *Insurance,* 163.

The evidence discloses so many violations of its duties by Cohen that it would require considerable space to name them all. First, it is uncontroverted that Cohen undertook and purported, for a consideration, to obtain for Chemical an effective public liability policy, and it failed to produce any policy whatsoever. On the contrary, all it produced was a spurious cover note from a sub-broker (without authority from its principal), a portion of which was freely acknowledged to be a "subterfuge." Under the ruling in *Hampton Roads, supra,* and the other authorities cited above, this would be all that was necessary to establish liability on the part of Cohen.

However, in addition to this, Cohen represented (to Chemical, the Maryland Department of Insurance, and Freidman) that the cover note which it delivered under its own label to Chemical was issued by "Lloyd's of London." It does not require an expert in the insurance field to see, even by a most casual examination, that Lloyd's of London was not a party to this instrument. We shall not repeat the difficulty experienced by Cohen's president, when he was requested to verify his alleged investigation of the financial stability of the insurers named in the cover note.

Moreover, Cohen obviously did not understand the significance of the "rubber stamp" on the cover note, as its president was unable to designate any language therein obligating in any manner the four insurance companies named, or any one of

them, and the signature on the cover note of General (which was well known to Cohen as a local broker) purporting to bind foreign, unauthorized insurance companies should have alerted any skillful insurance man as to the questionable validity thereof. The language used in the cover note represented that insurance had been "procured * * * from Underwriters at London, England, Subject, however, * * * *to the terms, conditions and provisions of Underwriters at London policy* * * issued by said Underwriters * * *." (Emphasis ours.) It is conceded that there is no such entity or insurance company in existence known as "Underwriters at London, England." It seems apparent that any insurance broker, by the exercise of the most meager care, could and should have ascertained that fact.

And Cohen should have known that a cover note, even when properly and authoritatively issued, is merely a binder or certificate representing that insurance had been procured and a policy, properly executed by the insurer, would follow at a later date, *K. C. v. Eureka, supra;* yet, it failed to see that any such policy was ever issued or delivered to Chemical.

The above constitute some of the specific acts of carelessness and lack of due diligence and care on the part of Cohen, and they are compounded by the fraud of Cohen's agents. We hold that Judge Sodaro committed no error in finding Cohen responsible.

## II

Cohen claims there are three defenses (which we consider below under [a], [b], and [c]) available to it even if a valid policy had been issued according to the terms of the cover note. In considering these contentions, we shall make two assumptions: we shall assume, without deciding, that any valid defense which could be offered by the insurer had the policy been issued is likewise an effective defense insofar as Cohen is concerned; and that Cohen is bound by the terms of the cover note to the extent that such an insurer would have been. Its position that it may raise "policy" defenses is tantamount to an admission that the terms and conditions of the "policy" are binding upon it, for the purposes of considering these contentions.

## (a)

The cover note, or "policy," contains the following provision under the heading "Definitions of Hazards."

### "INDEPENDENT CONTRACTORS"

"Operations performed for the named insured by independent contractors and general supervision thereof by the named insured, if the accident occurs in the course of such operations, other than * * *."

Since no premium for this coverage was paid by the appellee, Cohen argues that Coleman, being an employee of an independent contractor, appellee is not covered under the terms of the "policy." However, it paid premiums for Coverage A, which obligates the insurer to "pay as damages because of bodily injury * * * sustained by *any person,* caused by accident and *arising out of the hazards hereinafter defined."* Under the heading of "Definition of Hazards" for which appellee paid premiums and was covered, there appears the following: "1. Premises-Operations. The ownership, maintenance or use of the premises, *and all operations* during the policy period, which are *necessary or incidental thereto."* (Emphasis added.)

These two provisions are frequently found in public liability policies and have been construed on a number of occasions.

In the case before this Court, the injury sustained by Coleman resulted when he struck his head on an exposed valve having a sharp point, from which the handle or wheel had been removed and had not been replaced by the appellee, or its agent. If there were any negligence which caused the accident, it was directly attributable to appellee in the "maintenance or use" of its plant and "premises," one of the coverages of the policy. The duties of Burns and Coleman did not require them to maintain the plant or premises. The above provisions, or ones very similar thereto, have been construed by courts of high authority contrary to appellant's theory. In *Chrysler Motors v. Royal Indemnity Co.,* 174 P. 2d 318 (Cal.), the Court said: "The exclusion is not of persons working for an independent contractor but for liability arising out of work let or sublet to such contractor." See to like effect *Gulf Portland Cement Co. v. Globe Indemnity Co.,* 149 F. 2d 196 (C.A. 5). 7A.

Appleman, *Insurance Law & Practice*, § 4493.3, states the proposition thus: "An injury to an employee of a sub-contractor is covered where a liability policy covered *all operations necessary or incidental* to the insured's business." (Emphasis added.) In holding that this contention lacks merit, we note the appellant cited no authority whatever in support of its position.

(b)

The "policy" provides that it does not apply:

"1. To injury to any person who at the time of sustaining such injury is engaged in the service of *and/or acting on behalf of the insured.*" (Emphasis added.)

The appellant argues that even if Coleman were acting as an independent contractor and not encompassed within the terms "in the service of" the appellee, he was "acting on behalf" of it, and therefore was excluded. Counsel for appellant acknowledge that they could find no case construing these words "in the exact context of the policy exclusion in issue, or in the special circumstances of the instant case"; appellee cites none, and our research has failed to produce any.

The question is not entirely free from difficulty. However, Coleman was admittedly an employee of an independent contractor. There was no master-servant relationship between the appellee and Coleman. Workmen's Compensation was paid by Burns to Coleman and a third-party action was filed against the appellee which precipitated the present suit. Appellant's contention here seems to be inconsistent with its admission in its brief in which it concedes that the settlement with Coleman of the third-party action was fair and reasonable. This *concessum* tends to negate the theory that Coleman was acting on behalf of the appellee or that he was in its service.

It has been held that "the primary purpose of the words 'in the service of another' is to *require* the relation of master and servant and to *exclude* independent contractors [emphasis ours]." *Warren's case,* 97 N. E. 2d 184 (Mass.), and we think the supplemental phrase "on behalf of" was intended to broaden very little, if at all, the reach of the phrase "in the service of another." To broaden its scope to the extent urged by appellant would go a long way toward emasculating the protection

of a public liability policy; because, except possibly for trespassers, most persons lawfully upon the premises of another could be said (by applying a literal definition of the terms) to be doing something "on behalf of" an insured. Recognizing and applying the oft repeated principle that an ambiguity in an insurance policy prepared by the insurer should be construed in favor of an insured, we hold that Coleman did not come within the purview of the exclusionary provision here under consideration.

(c)

At this point, the appellant argues that the appellee failed to "comply with the notice requirements of the policy"; hence it is relieved of any responsibility for injuries resulting from the accident. Appellee counters by stating that no "notice of Coleman's injury [was] required to be given because of the slight nature of the injury," and that, in any event, appellant waived the notice requirements. As appellee's first contention is, we think, sound, we shall not discuss the second.

The "policy" provision follows:

> "The following conditions are deemed conditions precedent to the liability of Underwriters:
>
> * * *
>
> "4. NOTICE OF ACCIDENT
> When an accident occurs, written notice shall be given by or on behalf of the insured to Underwriters and/or their duly authorized representatives as soon as practicable."

The general rule is that a provision in an insurance policy requiring notice by the insured to the insurer as soon as practicable, when it is made a condition precedent, must be complied with in order to obligate the insurer. *Watson v. U. S. F. & G. Co.,* 231 Md. 266. Apart from the fact that "Underwriters" was non-existent and not an entity with "duly authorized representatives," we think this aspect of the present appeal is controlled by the holding in *Lennon v. American Farmers Mutual Ins. Co.,* 208 Md. 424.

In that case it was held that where there is apparently no injury from an accident and no reasonable ground for believ-

ing that an injury might ensue therefrom, the insured had no obligation to notify the insurer, even though serious injury developed therefrom, until a reasonable time after he became aware, in the exercise of ordinary care, of the serious aspects of the injury suggestive of a possible claim for damages under the policy. In the instant case, the injury to Coleman was slight; his head was "bleeding a little"; he did not want to go to appellee's doctor; he worked "off and on" for 3 or 4 weeks after the accident; and appellee's plant manager was never told why Coleman stopped work. The above facts did not indicate that a serious mental condition would result from the incident. It appears that Coleman's claim, which was settled, was based principally upon a psychiatric condition, which developed later, although he, of course, claimed that it resulted from the slight cut on his head. The appellee had no notice of any claim against it by Coleman until its resident agent received the "suit papers." Both Cohen and Lowitt were promptly notified. We hold that Chemical complied with the notice provision of the "policy."

We stated earlier in the opinion that Cohen and Lowitt separately appealed. They did, but Lowitt filed no brief and presented no argument, submitting his appeal on Cohen's brief. Cohen's brief was prepared by its counsel, who submitted contentions and arguments in its behalf. We find nothing in Cohen's brief that would be beneficial to Lowitt; we will, therefore, dismiss this appeal.

> *Appeal of Lowitt dismissed; judgment against Cohen affirmed; appellants to pay the costs.*