**UNITED CAPITOL INSURANCE COMPANY, Plaintiff–Appellee,**

v.

**Bernard KAPILOFF; Lynn Kapiloff, Defendants–Appellants,**

v.

**UNITED CAPITOL INSURANCE COMPANY; J.L. Hickman & Company, Incorporated, t/a IFA Insurance Services, Incorporated; Horan Goldman & Company of Maryland, Incorporated; Ray Miller, Defendants–Appellees.**

No. 97–2253.

United States Court of Appeals, Fourth Circuit.

Argued May 7, 1998.

Decided Sept. 8, 1998.

490

**ARGUED:** Andre R. Weitzman, Andre R. Weitzman & Associates, Baltimore, MD, for Appellants. Matthew L. Litsky, Butler, Burnette & Pappas, Tampa, FL; David J. McManus, Jr., Baxter, Baker, Sidle & Conn, P.A., Baltimore, MD; Lewis Herbert Gold, Adelman, Lavine, Gold & Levin, Philadelphia, PA, for Appellees. **ON BRIEF:** Steven J. Potter, Andre R. Weitzman & Associates, Baltimore, MD, for Appellants. John J. Pappas, Scott D. Clay, Butler, Burnette & Pappas, Tampa, FL, for Appellees.

Before WIDENER, NIEMEYER, and LUTTIG, Circuit Judges.

Affirmed in part, reversed in part, and remanded for further proceedings by published opinion. Judge NIEMEYER wrote the opinion, in which Judge WIDENER and Judge LUTTIG joined.

## OPINION

NIEMEYER, Circuit Judge:

Bernard and Lynn Kapiloff own six commercial properties in Baltimore City, which are located in high risk areas and have been partially vacant over the years. Portions of one property were vandalized in December 1994 and again in March 1995, and a fire broke out in another property in February 1995. The Kapiloffs submitted claims totaling $668,421 to United Capitol Insurance Company, their insurer, for those losses. United Capitol denied the claims because of "misrepresentations, omissions, and concealments" about the properties and, alternatively, because the properties violated the "vacancy" and "protective safeguards" conditions in its policy. Thereafter, United Capitol sued the Kapiloffs for a declaratory judgment, and the Kapiloffs filed a counterclaim for breach of contract. They also joined their insurance brokers as parties, alleging negligence.

Ruling that the properties were either vacant or lacked protective safeguards and that the "vacancy" and "protective safeguards" conditions in the insurance policy operated to exclude coverage for the losses, the district court entered summary judgment in favor of United Capitol. It also ruled in favor of the insurance brokers who procured the United Capitol policy on behalf of the Kapiloffs on the grounds that suitable insurance was not available in the market and that one broker was not an agent of the Kapiloffs.

For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings.

I

Among the six commercial properties that the Kapiloffs own in Baltimore City, two are involved in the insurance coverage disputes in this action. The first property, located at 2120 West Lafayette Avenue, is an industrial complex known as the Acme Business Center. It consists of two structures, both of which use the 2120 West Lafayette address. One structure is subdivided into five sections, referred to as buildings A, B, C, D, and F. The other structure is free-standing and is referred to as Building E. Although the sections of the subdivided building were originally connected by a basement passageway, today sections A, B, and C are connected with each other, but are separated by an internal brick wall from sections D and F. All five sections of this building share the same electrical and wiring system and are powered by an electrical plant that is located in the

basement of sections A and B. During the losses involved in this case, sections A, B, and C were vacant, and sections D and F were occupied by a tenant, as was Building E.

The second property, located at 5101 Andard Avenue, is known as the Empire Industrial Park, and consists of eight separate buildings, some of which share the 5101 address, while others have their own addresses. At the time of the loss to this property, tenants occupied 80% of the industrial park, but Building 292, where the fire damage was sustained, was apparently vacant, although the evidence is not totally clear on this.

To arrange commercial property insurance for the six commercial properties, the Kapiloffs contacted their insurance agent, Ray Miller of J.L. Hickman & Co., Inc., t/a IFA Insurance Services, Inc. (hereafter "IFA"). In September 1994, IFA submitted an application on behalf of the Kapiloffs to Horan Goldman & Company of Maryland, Inc. (hereafter "Horan Goldman"), a wholesale surplus lines broker, who obtained an insurance policy for the Kapiloffs from United Capitol Insurance Company, a surplus lines insurance company. Surplus lines are substandard risks that standard markets generally do not handle.

During the application process, Lynn Kapiloff gave Miller and IFA a list of the occupants at the six properties, the square footage of the buildings situated on them, and previous insurance information. Miller and IFA conveyed the information to Horan Goldman, who placed the insurance with United Capitol. United Capitol issued its policy to the Kapiloffs on December 6, 1994, insuring their properties against theft, vandalism, fire, and other risks, subject to the terms and conditions of the policy. The premium was $40,196. The United Capitol policy scheduled the two properties in question, each as a "building" described as "2120 Lafayette" and as "5101 Andard Ave." The policy imposed "Commercial Property Conditions," including (1) that the Kapiloffs maintain protective safeguards on their properties including an automatic sprinkler system, an automatic fire alarm, and a "central station" burglar alarm, and that if the Kapiloffs failed to satisfy this requirement, the policy would not cover any loss caused by fire, and (2) that if "the building where loss or damage occurs has been vacant for more than 60 consecutive days" before the loss, the policy will not cover the loss if caused by vandalism.

On December 30, 1994, vandals broke into sections A and B of the West Lafayette subdivided building and tore up and removed the power plant, causing extensive damage and a blackout of the entire building. While sections A, B, and C were vacant at the time, sections D and F were occupied by the Emmanuel Tire Company. Building E also was occupied. The Kapiloffs submitted a proof of claim for this loss in the amount of $549,725 for property damage and $14,065 for lost rent caused by the power outage. Two weeks after the incident, a claims adjustor examined the properties on behalf of United Capitol and found that the properties failed to meet the conditions of the insurance policy. The adjustor, however, did not advise the Kapiloffs of his findings until December 1995 when coverage was denied.

On February 15, 1995, a fire broke out in Building 292 on the Andard Avenue property. The Kapiloffs submitted a claim in the amount of $18,294 for this damage. While there is a factual dispute as to whether that property was occupied at the time, the Kapiloffs agree that Building 292 did not contain the protective safeguards required by the policy.

Finally, on March 14, 1995, the building at West Lafayette was again vandalized. Copper flashing and window frames were removed from the roofs of sections A, B, and C, for which the Kapiloffs submitted a claim in the amount of $86,337.

In December 1995, after a long review process, United Capitol denied all three claims. It stated that "based upon misrepresentations, omissions, and concealments" by the Kapiloffs and their representatives in the application process, it would regard the policy as rescinded *ab initio* and would return the premium paid. Alternatively, it noted that the Kapiloffs violated the policy condi-

tions that the properties have protective safeguards and not be vacant.

Shortly thereafter, United Capitol filed this action against the Kapiloffs seeking a declaratory judgment that it has no liability for the three claims. The Kapiloffs responded with a suit in state court against United Capitol and the insurance brokers, Miller, IFA, and Horan Goldman, alleging that United Capitol breached the insurance policy and that the brokers were negligent in procuring insurance coverage for the Kapiloffs. Based on the state action which they filed, the Kapiloffs then moved to dismiss this action, alleging that the district court should abstain because the more complete case was readily decidable by the state court. When the district court denied the Kapiloffs' motion to abstain, the Kapiloffs filed an answer and counterclaim in this action, joining Miller, IFA, and Horan Goldman as counterclaim defendants.

On the motion of United Capitol and the insurance brokers, the district court entered summary judgment in their favor, holding that because the properties were vacant and lacked protective safeguards, the "vacancy" and "protective safeguards" conditions in the insurance policy operated to exclude coverage. The court also rejected the Kapiloffs' contention that United Capitol waived its right to enforce these conditions by delaying its denial of coverage. Finally, the court entered judgment in favor of the brokers. With respect to Miller and IFA, the court concluded that any loss to the Kapiloffs for deficient insurance coverage was not proximately caused by any negligence of Miller and IFA. It dismissed Horan Goldman on the grounds that Horan Goldman was not an agent of the Kapiloffs and therefore owed them no duty.

On appeal, the Kapiloffs allege that the district court abused its discretion in refusing to abstain. On the substantive points, they argue not only that the court erred, but also that factual issues remained, precluding resolution of the issues by summary judgment.

## II

We first must address the issue, raised during oral argument, whether the district court had subject matter jurisdiction in view of the Kapiloffs' joinder of nondiverse parties as counterclaim defendants.

United Capitol filed this action for declaratory judgment against the Kapiloffs, relying on diversity jurisdiction conferred by 28 U.S.C. § 1332. The Kapiloffs filed a counterclaim for breach of contract. They also joined the insurance brokers as counterclaim defendants pursuant to Federal Rule of Civil Procedure 13(h). The question arose at oral argument whether joinder of these counterclaim defendants destroyed "complete diversity" as required by 28 U.S.C. § 1332. *See Owen Equip & Erection Co. v. Kroger*, 437 U.S. 365, 373, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978); *see also Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 267, 2 L.Ed. 435 (1806) (predecessor statute).

Despite the requirement of complete diversity for jurisdiction under 28 U.S.C. § 1332, 28 U.S.C. § 1367(a) confers supplemental jurisdiction over "all other claims that are so related to claims in the action within ... original jurisdiction that they form part of the same case or controversy...." Section 1367(a) states that "[s]uch supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." This supplemental jurisdiction, however, is limited by subsection (b), which states:

> [T]he district courts shall not have supplemental jurisdiction under subsection (a) over claims by *plaintiffs* against persons made parties under Rule 14 [impleader], 19 [compulsory joinder], 20 [permissive joinder], or 24 [intervention] of the Federal Rules of Civil Procedure, or over claims by *persons proposed to be joined as plaintiffs* ... or seeking to intervene as *plaintiffs* ... when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

28 U.S.C. § 1367(b) (emphasis added). Thus, the limitation of § 1367(b) applies only to *plaintiffs'* efforts to join nondiverse parties. *See, e.g.,* Denis F. McLaughlin, *The Federal Supplemental Jurisdiction Statute—A Constitutional and Statutory Analysis*, 24 Ariz. St. L.J. 849, 857 (1992) ("[T]he statute ex-

empts defendants from the restrictions of § 1367(b) and thus fully preserves supplemental jurisdiction for claims asserted by defendants in all actions, whether founded on federal question, diversity of citizenship, or any other jurisdictional basis").

The subsection (b) limitations of supplemental jurisdiction are designed to prevent plaintiffs from circumventing the requirements of diversity. The House Report in the legislative history of § 1367(b) explains that its purpose is to prevent "plaintiffs [from being able] to evade the jurisdictional requirement of 28 U.S.C. § 1332 by the simple expedient of naming initially only those defendants whose joinder satisfies section 1332's requirements and later adding claims not within original federal jurisdiction against other defendants who have intervened or been joined on a supplemental basis." H.R. No. 101–734, at 29 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6860, 6875; *see also* 28 U.S.C.A. § 1337 Practice Commentary (West 1993) (noting that the purpose of § 1367(b) is to prevent the "efforts of a plaintiff to smuggle in claims that the plaintiff would not otherwise be able to interpose"). Thus, although Congress wanted, in enacting § 1367, to enable parties to resolve in one action all of their disputes arising from the same core of facts and thereby to conserve judicial resources, it did not want plaintiffs to be able to plead a complaint craftily so as to force a nondiverse case into federal court. Because defendants are involuntarily brought into court, their joinders and impleaders were not deemed as suspect as those of the plaintiff, who is master of his complaint.

In the case before us, United Capitol, the plaintiff, did not join additional parties nor did it seek to assert claims against any additional parties. It was the Kapiloffs, as the declaratory judgment defendants, who joined the nondiverse insurance brokers as additional parties, naming them *counterclaim defendants.* Because § 1367(b) does not limit this joinder, we are satisfied that the district court had subject matter jurisdiction over this case.

## III

The Kapiloffs contend as a threshold matter that the district court abused its discretion in refusing to abstain in the federal declaratory judgment action in favor of the suit that they filed in state court against United Capitol and the insurance brokers.

The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that district courts "may declare" the rights of interested parties. This permissive language has long been interpreted to provide discretionary authority to district courts to hear declaratory judgment cases. *See, e.g., Brillhart v. Excess Ins. Co.,* 316 U.S. 491, 494, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942). As we have often noted, "district courts have great latitude in determining whether to assert jurisdiction over declaratory judgment actions." *Aetna Cas. & Sur. Co. v. Ind–Com Elec. Co.,* 139 F.3d 419, 422 (4th Cir.1998); *Centennial Life Ins. Co. v. Poston,* 88 F.3d 255, 256 (4th Cir.1996); *Aetna Cas. & Sur. Co. v. Quarles,* 92 F.2d 321, 324 (4th Cir.1937). Accordingly, we review a district court's decision to exercise authority to proceed with a declaratory judgment action for abuse of discretion. *See, e.g., Wilton v. Seven Falls Co.,* 515 U.S. 277, 286–89, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995); *Centennial Life Ins.,* 88 F.3d at 257–58.

But district courts are not without guidance in exercising this discretion. We have explained that a declaratory judgment "is appropriate 'when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and ... when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Centennial Life Ins.,* 88 F.3d at 256 (quoting *Quarles,* 92 F.2d at 325) (ellipses in original). At the same time, whenever a parallel proceeding is pending in state court, district courts must also take into account "considerations of federalism, efficiency, and comity." *Nautilus Ins. Co. v. Winchester Homes, Inc.,* 15 F.3d 371, 376 (4th Cir.1994). To aid district courts in balancing the state and federal interests when a parallel state action is pending, we have articulated four factors for consideration: (1) whether the state has a strong interest in

having the issues decided in its courts; (2) whether the state courts could resolve the issues more efficiently than the federal courts; (3) whether the presence of "overlapping issues of fact or law" might create unnecessary "entanglement" between the state and federal courts; and (4) whether the federal action is mere "procedural fencing," in the sense that the action is merely the product of forum-shopping. *See Nautilus*, 15 F.3d at 377.

Applying these guidelines to the case before us, a declaratory judgment action would undoubtedly "serve a useful purpose" in settling the disputed rights of United Capitol and the Kapiloffs under the insurance policy, and a declaratory judgment would "afford relief" from the uncertainty of whether coverage exists under the policy. It is well established that a declaration of parties' rights under an insurance policy is an appropriate use of the declaratory judgment mechanism. The declaratory judgment action is designed to allay exactly the sort of uncertainty that flows from the threat that ambiguous contractual rights may be asserted. The declaratory judgment action allows the uncertain party to gain relief from the insecurity caused by a potential suit waiting in the wings. Thus, the district court acted reasonably in recognizing in this case the value of declaring the parties' rights.

Still, "considerations of federalism, efficiency, and comity" are quite palpable in this case. Although the Kapiloffs brought their state action *after* United Capitol filed its declaratory judgment action, at the time of the district court's decision not to abstain, the state action was pending. The existence of this state action therefore animates the issues of federalism and comity and counsels careful examination of the factors identified in *Nautilus*.

First, the interests of Maryland in deciding this case were not particularly significant. Although the case is entirely one of state law, the issues involved are standard ones of agency and contract interpretation. A federal court would be unlikely to break new ground or be faced with novel issues of state interest.

Second, concerns of efficiency cut both ways. On the one hand, the action in state court included more parties than did the federal action, suggesting that the state action would be more efficient in resolving all interested parties' rights. On the other hand, as between United Capitol and the Kapiloffs, both actions could efficiently determine the parties' positions. Not only is the case mostly a factual one which a federal court could just as efficiently decide as a state court, but joinder of any relevant parties from the state action would more or less be an inevitability if the federal action proceeded.

Third, since both actions raised the same core issues of law and fact, and both actions aimed at determining the rights of the parties under the insurance policy, potential entanglement between the state and federal courts was a genuine possibility.

And fourth, the evidence of "procedural fencing" was scant. As the district court noted, there was "little or no indication that plaintiff filed this case in the guise of 'procedural fencing.'" United Capitol filed this action to resolve questions that are traditionally resolved in declaratory judgment actions, and it did so under standard diversity jurisdiction. While United Capitol may have guessed that the Kapiloffs would eventually file a suit of their own, it could not have known that the Kapiloffs would necessarily name nondiverse parties to that suit, making their state suit unremovable. Without more, we cannot say that United Capitol's action is an instance of forum-shopping instead of a reasonable assertion of its rights under the declaratory judgment statute and diversity jurisdiction.

With this set of mixed indicators and with the declaratory judgment mechanism appropriately employed to serve a useful purpose in clarifying the parties' rights, we cannot conclude that the district court abused its discretion in electing to proceed with this action.

## IV

On the merits of the coverage issue for the property at 5101 Andard Avenue, the district court concluded that Building 292 was

burned through an act of vandalism and that at the time of the fire, the building was vacant and had been vacant for 60 days. The court also noted that Building 292 did not have an automatic sprinkler system, a fire alarm, or other protective device required by the policy. Even though the policy was issued for the "building" at 5101 Andard Avenue, a location that consisted of eight separate buildings which were 80% occupied, the court treated Building 292 as a separate building, concluding that because it was vacant and unprotected by automatic sprinkler and fire alarm devices, the damage from the fire at Building 292 was not covered by the policy.

As to the two losses in December 1994 and March 1995 at 2120 West Lafayette Avenue, the court similarly noted that the damage was caused by vandalism. As it did for 5101 Andard Avenue, the court concluded that the five separate sections of the subdivided building at 2120 West Lafayette Avenue were separate buildings for purposes of coverage. Since sections A, B, and C, where the vandalism occurred, were vacant, the court applied the vacancy provision to deny coverage, even though it recognized that sections D and F were occupied, as was the separate building known as Building E.

The Kapiloffs do not dispute the fact that vandalism caused the damage to their properties. They argue that the properties at both 5101 Andard Avenue and 2120 West Lafayette Avenue were insured as single properties, each designated in the policy as a "building." Since portions of both complexes were clearly not vacant, the Kapiloffs argue that the court erred in applying the vacancy exclusion against them. They maintain, alternatively, that the policy is ambiguous in this regard and that questions of fact exist that could not properly be disposed of as matters of summary judgment.

The policy provides that United Capitol will pay for physical loss or damage to "Covered Property at the premises described in the Declarations." "Covered Property" is defined to mean "Building, meaning the building or structure described in the Declarations." In the declarations, "building" is described as 2120 Lafayette Avenue and 5101 Andard Avenue.

The policy imposed conditions for coverage that the premises contain "protective safeguards" and that they not be vacant. The protective safeguards condition reads:

> As a condition of this insurance, you are required to maintain the protective devices or services listed ... Automatic Sprinkler System ... Automatic Fire Alarm ... [and Central Station Burglar Alarm].... We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you ... [f]ailed to maintain any protective safeguards ... in complete working order.

The vacancy condition reads:

> If the building where the loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage, we will ... [n]ot pay for any loss or damage caused by ... vandalism.

In Maryland, insurance policies are not, in the first instance, construed most strongly against the insurer. *See Collier v. MD–Individual Practice Ass'n,* 327 Md. 1, 607 A.2d 537, 539 (1992); *Catalina Enterprises, Inc. v. Hartford Fire Ins. Co.,* 67 F.3d 63, 65 (4th Cir.1995). Rather, Maryland courts interpret insurance policies as a whole, according words their usual, everyday sense, giving force to the intent of the parties, preventing absurd results, and effectuating clear language. *See Catalina Enterprises,* 67 F.3d at 65–67; *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.,* 330 Md. 758, 625 A.2d 1021, 1031 (1993). In the event of ambiguity, Maryland courts consult extrinsic evidence, and only if this extrinsic evidence fails to clear up the ambiguity is the contract construed against the insurer. *See Cheney v. Bell Nat'l Life Ins. Co.,* 315 Md. 761, 556 A.2d 1135, 1138 (1989).

With respect to the loss claimed for the Andard Avenue property, even the Kapiloffs concede that the outcome appears obvious. The record evinces no evidence that there were any protective safeguards at Building 292 of the Andard property. Furthermore, there is no evidence that any other structure at 5101 Andard Avenue had the full panoply

of required safeguards. Because there is no evidence from which the jury could conclude that protective safeguards were on the property at all, let alone at the particular building that experienced fire damage, the district court correctly entered summary judgment against the Kapiloffs with respect to that claim.

■ The two claims made for the vandalism at the Lafayette Avenue property entail more analysis. While sections A, B, and C of one structure at 2120 West Lafayette Avenue were vacant at the time of, and for more than 60 days before, the two acts of vandalism, sections D and F of that same structure, as well as the free-standing Building E, were fully occupied. Because the damage was sustained to sections A, B, and C, which were vacant, the issue boils down to whether a court could find, as a matter of law, that the subdivided structure constituted *separate buildings,* and not a *single building.* The policy is silent as to whether sections of a contiguous structure constitute separate "buildings" under the policy, and under Maryland law, we must therefore consider extrinsic evidence of the parties' intent.

There is a reasonable amount of evidence to support the district court's view that the Lafayette Avenue subdivided structure consists of five separate "buildings" under the policy. First, the structure cannot be traversed entirely from the inside. A person wishing to travel the length of the entire structure must exit and re-enter between sections C and D of the structure. Second, the Kapiloffs listed the structure, when marketing it to prospective tenants, as five separate "buildings." Third, the Kapiloffs have described the complex as "consist[ing] of 6 multi-purpose buildings." And finally, the different sections of the structure are of different heights, suggesting that each section is a different building.

On the other hand, there is also substantial evidence that the structure is a single building under the policy. First, Bernard Kapiloff testified that the entire structure was built at the same time. Second, there is evidence that the entire structure was once traversable through the basement before the ramp between sections C and D was bricked

over. Third, the entire structure is contiguous, sharing the same walls and building materials—brick and masonry. Fourth, the entire structure shares the same power plant and system of electrical wiring. Fifth, in the same document that the Kapiloffs describe the complex as consisting of six buildings, they also mentioned that "[t]he northern end of *the building* is occupied by the Emmanuel Tire Company." (Emphasis added). And finally, the policy states that "covered property" includes "building, meaning the building or structure described in the Declarations," and the declarations only mention the single address of the entire property. Thus, when the policy describes a property, it does not refer to coverage of separate buildings, but rather refers to the entire address as a single "building" under the policy.

With this evidence in the record, a factfinder could reasonably find that the parties intended that the sections of the Lafayette Avenue structure constituted one insured "building" just as easily as it could find that they were separate "buildings" under the policy. The purpose of the vacancy provision is to exclude those structures which present a higher insurance risk than exists for occupied buildings. *See Catalina Enterprises,* 67 F.3d at 67. Thus, sections A, B, and C, by their vacant nature, would appear to present a higher risk than do sections D and F. By the same token, the fact that the five sections were contiguous and in the same location indicates that there might be less risk than there would be for free-standing buildings which are completely unoccupied.

In considering the practical insurance risks attending a single, subdivided structure such as the Lafayette Avenue structure, we are prompted to ask: Would a single structure of several rowhouses be one building or multiple buildings? What if the houses were connected through the basement or through first-floor fire doors? Is a single structure divided into multiple condominiums one building or many? What about a factory complex involving an assembly line structure connected to a shipping structure? A court would be hard pressed to find categorically, as a matter of law, that any given style of contiguous structure is a single building or

multiple buildings. Rather, each ruling would depend on the circumstances of the individual case, the language of the policy, and ultimately the intent of the parties to the policy.

Because this issue is best suited to fact-finding, we reverse the district court's summary judgment in favor of United Capitol on this issue and remand it to the district court for further proceedings.

## V

■ The Kapiloffs also argue that United Capitol waived, or was estopped from relying on, the policy's "vacancy" and "protective safeguards" conditions because it failed to inform the Kapiloffs of the findings made during the inspection of the properties in January 1995 which affected continuing coverage. They argue that when United Capitol inspected the properties in January following the December 1994 loss, it became aware that both the Lafayette Avenue and Andard Avenue properties were vacant and without protective safeguards. Yet it failed to inform the Kapiloffs at that time of these facts. Thus, the Kapiloffs argue that when they sustained losses thereafter in February and March 1995, United Capitol should not then have been able to argue that the policy did not cover these losses because it had waived the right to make, or was estopped from making, this argument.

■ Under Maryland law, an insurance company may waive a condition of its policy by its conduct when it induces an honest belief that the condition is not required, when the insured is duly misled, and when no extension of coverage results from the waiver. *See A/C Elec. Co. v. Aetna Ins. Co.*, 251 Md. 410, 247 A.2d 708, 713 (1968); *McFarland v. Farm Bureau Mut. Auto. Ins. Co.*, 201 Md. 241, 93 A.2d 551, 554 (1953). That is, waiver or estoppel may occur only when it does not create new coverage; an extension of coverage may only be created by a new contract. *See Prudential Ins. Co. v. Brookman*, 167 Md. 616, 175 A. 838, 840 (1934).

In this case, if we were to accept the contention that United Capitol's silence precluded it from asserting the limitations of

coverage imposed by the "vacancy" and "protective safeguards" conditions, we would in effect be extending coverage beyond that provided for in the policy, in contravention of Maryland law.

Moreover, if we were to find that United Capitol's failure to notify its insured justified a detrimental reliance by the insured sufficient to extend coverage, we would be imposing a new affirmative duty on insurance companies to notify insureds that their property might not be insured whenever it has such a suspicion. Not only would this create a duty between the parties outside of the insurance contract, it would be creating new law for Maryland.

Finally, the amount of time it took for United Capitol to determine that the Kapiloffs' properties were not in compliance with the policy would not, as a matter of law, be long enough in any event to constitute a waiver of any right under the policy. As the district court appropriately pointed out in its opinion, an insurance company that denies coverage or rescinds the policy in bad faith risks liability for that action. *See, e.g., Monumental Life Ins. Co. v. United States Fidelity and Guar. Co.*, 94 Md.App. 505, 617 A.2d 1163, 1181 (1993). In making coverage decisions, an insurance company must be entitled to a sufficient time to collect the facts, evaluate them, and make legal determinations with respect to those facts. These activities require not only field work but also an internal evaluation with a review by appropriate personnel. The one or two months urged by the Kapiloffs as supporting the finding of waiver or estoppel would hardly provide an insurance company with adequate time to make this kind of a decision, particularly when its liability for a wrongful decision could expose it to the risk of bad faith.

For these reasons, we affirm the district court's ruling that United Capitol did not waive, nor was it estopped from asserting, the vacancy and protective safeguard conditions of the policy.

## VI

■ In their case against the insurance brokers, the Kapiloffs allege that the brokers were negligent, breaching a duty of care to

498

obtain suitable insurance for them. *See Pop-ham v. State Farm Mut. Ins. Co.*, 333 Md. 136, 634 A.2d 28, 36 (1993); *Lowitt v. Pearsall Chem. Corp.*, 242 Md. 245, 219 A.2d 67, 73 (1966).

The district court, however, entered summary judgment in favor of all of the brokers. It dismissed the claim against Horan Goldman, holding that the record did not contain evidence that Horan Goldman was an agent of the Kapiloffs because they failed to demonstrate "the requisite 'manifestation of consent' to establish an agency relationship between themselves and Horan Goldman." In the absence of an agency relationship, the court concluded that Horan Goldman owed no duty to the Kapiloffs as an insurance broker.

■ The district court's analysis, however, failed to recognize the role served by Horan Goldman in placing insurance with United Capitol on behalf of the Kapiloffs. After the Kapiloffs requested that Miller and IFA procure insurance for their Baltimore City properties, Miller and IFA presented an application on behalf of the Kapiloffs to Horan Goldman, a wholesale broker specializing in surplus lines, requesting that Horan Goldman place the Kapiloffs' application with an appropriate insurance company. It was Horan Goldman who identified United Capitol as a suitable insurer and who placed the insurance on behalf of the Kapiloffs with United Capitol. Moreover, on their proofs of loss, the Kapiloffs showed Horan Goldman as their agent. The fact that the Kapiloffs did not communicate directly with Horan Goldman is not fatal to finding that Horan Goldman served either as an agent or a subagent of the Kapiloffs. What is critical is whether Horan Goldman knew of the Kapiloffs and acted on their behalf at the request of IFA. *See Restatement (Second) of Agency* § 428(1) ("A subagent who knows of the existence of the ultimate principal owes him the duties owed by an agent to a principal"); *Restatement (Second) of Agency* § 5(1) (A subagent is a person retained by an agent to perform functions undertaken by the agent for the principal). While Horan Goldman argues that it was a broker acting as a middleman between the insured and the insurer, that

fact does not refute the general principle that just such a relationship can be an agency relationship. *See American Cas. Co. v. Ricas*, 179 Md. 627, 22 A.2d 484, 487 (1941). At bottom, the Kapiloffs argue that Horan Goldman was in fact an agent or subagent of theirs, and as such, owed them a duty of reasonable care in procuring insurance from United Capitol. The question thus is whether the evidence in the record was sufficient to justify a jury's finding that Horan Goldman was an agent or subagent of the Kapiloffs. We think that it is.

■ Under Maryland law, an agency relationship exists when (1) the agent is subject to the principal's control; (2) the agent has a duty to act primarily for the benefit of the principal; and (3) the agent has the power to alter the legal relations of the principal. *See Patten v. Board of Liquor License Comm'rs*, 107 Md.App. 224, 667 A.2d 940, 947 (1995). In this case, the record shows first that Horan Goldman was engaged by IFA with the knowledge of the Kapiloffs, and Horan Goldman knew it was making application for the Kapiloffs. Second, Horan Goldman acted to relay the information about the Kapiloffs to United Capitol and to apply for insurance in their name. Third, Miller testified that he understood Horan Goldman to be acting under a similar level of duty and care to the Kapiloffs as he was. And finally, the Kapiloffs recognized Horan Goldman as their agent as evidenced on the proofs of loss they submitted to United Capitol.

Because the district court's disposition of this issue was on summary judgment, we must make all reasonable inferences about Horan Goldman's role in the purchase of the Kapiloffs' policy in favor of the Kapiloffs. From the evidence, it is reasonable to infer that the Kapiloffs had some measure of control over Horan Goldman's actions through IFA. Despite the fact that the Kapiloffs never directly contacted Horan Goldman, the Kapiloffs did have extensive contact and control over Miller who engaged Horan Goldman. Both Horan Goldman and the Kapiloffs were aware of their relationship with each other. Undoubtedly, had the Kapiloffs instructed Miller to change their application or not to submit it to United Capitol, Horan

Goldman would have been required to honor the instruction.

It is also reasonable to infer that Horan Goldman was acting primarily in the Kapiloffs' benefit. As an insurance broker, Horan Goldman helped the Kapiloffs procure the insurance.

And finally, it is reasonable to infer that Horan Goldman was empowered to bind the Kapiloffs. When Horan Goldman submitted the Kapiloffs' application to United Capitol, it made an offer to contract on behalf of the Kapiloffs. When the policy was accepted by United Capitol, it operated to bind the Kapiloffs.

If a jury could infer that Horan Goldman was an agent or subagent of the Kapiloffs, it follows that Horan Goldman was under a duty of reasonable care to the Kapiloffs. *See Popham*, 634 A.2d at 36. We therefore reverse the district court's dismissal of Horan Goldman from this action and remand to allow a factfinder to decide whether the insurance that Horan Goldman procured was undertaken pursuant to its duty as the Kapiloffs' agent or subagent.

## VII

 Finally, the Kapiloffs argue that the district court erred in concluding as a matter of law that the insurance brokers' negligence could not have proximately caused the inadequacies of coverage because more adequate insurance was not available for the Kapiloffs' property. They argue that the district court overlooked facts in the record that Miller, IFA, and Horan Goldman knew of the nature of the Kapiloffs' properties and the limitations of coverage in the United Capitol policy and that they could have, had they not acted negligently, procured coverage for the losses in question.

 Under Maryland law, when an agent undertakes to procure insurance and fails to do so, or when he fails to inform the principal of the nonavailability of insurance from a prospective insurer so that the principal can obtain insurance from another insurer, the agent may be liable. *See Lowitt*, 219 A.2d at 73; *Patterson Agency, Inc. v. Turner*, 35 Md.App. 651, 372 A.2d 258, 262 (1977). The burden of proving the nonavailability of insurance coverage is on the insurer or the broker, because it is an affirmative defense that is within the peculiar knowledge of those familiar with the market. *See Patterson*, 372 A.2d at 261. Furthermore, a broker cannot meet its burden of showing a lack of proximate cause between its failure to properly procure insurance and the insured's lack of coverage merely by showing that the insurer which it approached would not supply the insurance in question. Testimony that a particular insurer cannot supply insurance "is a far cry from evidence demonstrating that such insurance is not elsewhere available." *Id.* at 261–62.

Turning to the record in this case, even though the Kapiloffs did not have the burden of proof, they produced evidence that could create an inference that the Kapiloffs' properties could be covered with suitable insurance. First, they have produced testimony to the effect that some markets might insure large, vacant buildings. Second, they have produced evidence that lack of occupancy sometimes "simply affect[s] the premium rate." And third, they have produced evidence that United Capitol itself sometimes writes policies for vacant buildings that are similar to those which the Kapiloffs sought to have insured.

While the Kapiloffs did not produce evidence that United Capitol would have covered them or that their particular buildings could be insured, they were not required to produce this evidence to withstand summary judgment because it is not their burden to show that coverage was unavailable in the first place. Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, *and on which that party will bear the burden of proof at trial.*" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (emphasis added). Because the burden was on the brokers, not the Kapiloffs, it was error to foreclose this issue by summary judgment. We remand this issue also for further proceedings.

## VIII.

In summary, we affirm the district court's subject matter jurisdiction over this case, its decision to proceed with a declaratory judgment request, its ruling denying coverage on the Andard Avenue property, and its ruling denying the Kapiloffs' claims of waiver and estoppel, and we reverse and remand for factfinding its rulings denying coverage on the Lafayette Avenue property and its rulings dismissing the insurance brokers.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.*